## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>MICHAEL GLICKERT, DC,<br>JOSEPH NOVOF, MD, THE<br>VANGUARD CLINIC, LLC, AND<br>FLEUR DE LIS, LLC,<br><br>*Defendants*. | Civil Action No. |

## COMPLAINT

The United States of America brings this action to recover losses from false claims submitted to the Medicare Program and TRICARE by Defendants Michael Glickert, DC ("Glickert"), Joseph Novof, MD ("Novof"), The Vanguard Clinic LLC ("Vanguard"), Fleur de Lis, LLC ("FDL" and, collectively with Glickert, Novof, and Vanguard, "Defendants") for electronic stimulation procedures performed with the RST Sanexas neoGEN-Series device ("Sanexas" or the "Sanexas device"), with or without accompanying vitamin injections, and fraudulently billed under various procedure codes and injection codes. Defendants Glickert, Novof, and Vanguard (collectively, the "Providers") also submitted false claims to the Medicare Program for ancillary services performed in conjunction with electronic stimulation using the Sanexas device ("Sanexas treatment"), including epidermal nerve fiber density ("ENFD") testing and autonomic nervous system ("ANS") and vascular function assessments performed with the "TM Flow" system of devices. During an over year-and-half period, Medicare paid Defendants $360,222.26 and

TRICARE paid Defendants $2,729.34 for thousands of false and/or fraudulent claims. In addition, Defendants marketed and sold Sanexas devices, developed and marketed vitamin injections, and provided billing and coding advice to healthcare providers nationwide, including in this district, causing Medicare and Tricare to pay for millions of dollars in false and/or fraudulent claims.

In September 2018, after nine straight months of losing money, facing approximately $140,000 in loans and $60,000 in credit card debt, and on the verge of bankruptcy, Glickert and Vanguard were at a crossroads. Around that time, Glickert spoke with a sales representative for RST Sanexas Inc. ("RST"), which manufactures the over-$40,000 Sanexas device. Glickert knew that the only way to recoup such a large capital expense – and ultimately become profitable – was to bill Sanexas treatment to Medicare. Glickert told the RST sales representative, "If I'm going out, I'm going out big." On September 13, 2018, Glickert and Novof purchased a Sanexas device for use in Vanguard.

The day after purchasing the Sanexas device, the Providers engaged a medical biller, known to the parties as M.E., who led the National Billing Institute, LLC ("NBI"). Glickert gave M.E. the first set of Current Procedural Terminology ("CPT") Codes to use for billing Sanexas treatment, based on the codes that Glickert learned from using a predecessor electronic stimulation device.

To maximize Medicare reimbursements, Glickert began purchasing a vitamin injection blend from RST, which consisted of over-the-counter vitamin and minerals, as well as Chinese herbs. When RST stopped producing its vitamin blend, Glickert, who lacks any medical credentials to select ingredients to be injected in the human body, developed his own vitamin blend, which came to be known in the industry as the "Glickert Blend." Glickert selected some of the ingredients in the Glickert Blend based on how well they

were reimbursed by Medicare and other insurance carriers.

In January 2019, Glickert created the first post regarding Sanexas on a password-protected forum viewed by hundreds of chiropractors and podiatrists called "TX Fibro." The post was titled "RST SANEXAS – LIFE CHANGER!!!" and began with a photo of Vanguard's case manager kissing a check for over $10,000 from an insurance company that had reimbursed for Sanexas treatment:



Glickert then began receiving kickbacks from RST for referring providers that purchased the Sanexas device. In September 2019, Glickert and Novof formed FDL, which became an official distributor of Sanexas devices. FDL ultimately received hundreds of thousands of dollars in kickbacks from RST for referring providers all over the country to purchase the Sanexas device.

In December 2020, Vanguard and Glickert filed suit against NBI, RST, and others, alleging that they were duped into purchasing Sanexas devices based on false promises that Sanexas treatment and vitamin injections were covered by Medicare. Notably, Vanguard and Glickert admitted that their billing of Sanexas treatment and vitamin injections was not covered by Medicare under the applicable coverage determinations and that the codes that they had been billing were improper. Nevertheless, Defendants

continued billing Sanexas treatment and ancillary services to Medicare and TRICARE.

Defendants knew, deliberately ignored, or recklessly disregarded that fact that their claims for Sanexas treatment and ancillary services they submitted to federal healthcare programs were not covered. Nevertheless, with each claim, Defendants falsely certified that these items and services were medically necessary.

By presenting false claims to federal healthcare programs for Sanexas treatment and ancillary services, Vanguard caused the United States to pay over $360,000 in false claims, and Defendants caused other providers to successfully bill millions of dollars in false claims, for which the government now seeks damages and penalties under the False Claims Act (the "FCA"). A nonexhaustive list of examples of such false claims is attached as Exhibit 1 and incorporated herein by reference.

## I.    NATURE OF THE ACTION

1.    The United States brings this law enforcement civil action alleging that Defendants have violated the FCA and Anti-Kickback Statute and seeks to recover treble damages and civil penalties, and any other available remedies.

## II.    THE PARTIES

2.    Plaintiff, the United States of America, brings this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), on behalf of the Medicare Program, as well as the Defense Health Agency, which manages the TRICARE program.

3.    Defendant Michael Glickert, DC is a chiropractor and owner of Vanguard and co-owner of FDL. Glickert resides in St. Louis, Missouri.

4.    Defendant Joseph Novof, MD is a medical doctor, Medical Director and

former co-owner of Vanguard, and co-owner of FDL. Novof resides in St. Louis, Missouri. The United States conducted a CID examination of Defendant Novof on April 17, 2025, and that testimony is referred to herein.

5.      Defendant The Vanguard Clinic, LLC is a Limited Liability Company organized under the laws of Missouri that has its former principal place of business at 11605 Studt Ave., Suite 120, St. Louis, MO. In April 2018, Novof purchased a 5% share of Vanguard from Glickert. In January 2019, Novof purchased another 5% share (10% total share) of Vanguard from Glickert. In September 2019, Novof purchased a final 5% share (15% total share) of Vanguard from Glickert. On December 15, 2021, Novof sold his 15% share of Vanguard to Glickert, who is now 100% owner of Vanguard.

6.      Defendant Fleur de Lis Health, LLC is a Limited Liability Company organized under the laws of Missouri that is registered at 1506 South Warson Rd., Saint Louis, MO. At its inception, Novof owned 75.5% of FDL and Glickert owned 24.5% of FDL.

III.    **JURISDICTION AND VENUE**

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345. This civil action arises under the laws of the United States, and this civil action is brought by the United States as a plaintiff pursuant to the FCA.

8.      The Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have transacted business within the Eastern District of Pennsylvania.

9.      Venue is proper in the Eastern District of Pennsylvania under 31 U.S.C. § 3732(a) because Defendants transacted business in the district and caused

medical providers in this district to submit false claims to Medicare in violation of

31 U.S.C § 3730.

## IV.    THE LAW

### A.    The False Claims Act

10.    The FCA provides, in pertinent part, that any person who:

> "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent; [or]
>
> (C)   conspires to commit a violation of subparagraph (A) [or] (B . . .

is liable to the United States Government [for statutory damages and such penalties as

are allowed by law]." 31 U.S.C. §§ 3729(a)(1)-(3) (2006), as amended by 31 U.S.C.

§  3729(a)(1)(A)-(C) (2010).

11.    "Claim" is defined in the FCA as

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2).

12.    The FCA provides that "material" means "having a natural tendency to

influence, or be capable of influencing, the payment or receipt of money or property." 31

U.S.C. § 3729(b)(4).

13.    The FCA provides that "knowing" and "knowingly" "(A) means that a

person, with respect to information—

    i.    has actual knowledge of the information;
    ii.   acts in deliberate ignorance of the truth or falsity of the information; or
    iii.  acts in reckless disregard of the truth or falsity of the information; and

  (B) requires no specific intent to defraud."

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

14.     The FCA, 31 U.S.C. § 3729(a)(1), provides that any person who violates the Act is liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 28 C.F.R. § 85.5 (setting forth the current penalties level of not less than $13,508 and not more than $27,018 for violations of the FCA).

15.     These obligations include returning an overpayment paid by Medicare or TRICARE. Under federal law,

An overpayment must be reported and returned . . . by the later of—
(A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable.

42 U.S.C. § 1320a-7k(d)(2).

**B.    The Anti-Kickback Statute**

16.     The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To

protect the integrity of the program from these harms, Congress enacted a prohibition against payment of kickbacks in any form. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

17.     The AKS prohibits any person or entity from knowingly and willfully soliciting or receiving remuneration to induce or reward any person for referring, recommending, or arranging for federally funded medical services, including services provided under the Medicare program. *See* 42 U.S.C. § 1320a-7b(b).

18.     The scienter element of the AKS is established by showing that "one purpose" of the remuneration at issue was to induce purchases or referrals, even if the remuneration also had other purposes that were legitimate. *See, e.g.*, *United States v. Greber*, 760 F.2d 68 (3d Cir. 1985); *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989); *see also United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). The AKS provides that: "With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." 42 U.S.C. § 1320a7b(h).

19.     A violation of the AKS is established when "at least one" claim submitted to a federal healthcare program links to the alleged kickback scheme. *See, e.g.*, *United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89 (3d Cir. 2018). The AKS does not require the government to demonstrate that federal beneficiaries would not have used the services at issue "but for" the alleged kickback, nor does it require a showing that a kickback directly influenced a patient's decision to use those services. *Id.*

8

20.     As a matter of law, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g).

21.     In the Patient Protection and Affordable Care Act ("ACA"), Congress intended to codify the pre-existing legal consensus "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil action under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854 (daily ed. Dec. 21, 2010); *see also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (holding that under the pre-ACA AKS, all claims resulting from illicit kickbacks constituted false claims under the FCA); *see also United States ex rel. Capshaw v. White*, No. 3:12-cv-4457, 2018 WL 6068806, at *4 (N.D. Tex. Nov. 20, 2018).

22.     A claim for reimbursement from a Federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. § 1320a-7b(g). Under this provision, claims submitted to federal health care programs that result from violations of the AKS are per se false or fraudulent within the meaning of 31 U.S.C. § 3729(a)(1)(A)-(B). Accordingly, a person violates the FCA when he or she knowingly submits or causes to be submitted claims to federal health care programs that result from violations of the AKS.

### C.     The AKS and Physician-Owned Distributors (PODs)

23.     On September 8, 1998, OIG issued an Advisory Opinion noting that "any compensation arrangement between a Seller and an independent sales agent for the purpose of selling health care items or services that are directly or indirectly reimbursable by a Federal health care program potentially implicates the anti-kickback statute,

irrespective of the methodology used to compensate the agent." In particular, OIG expressed concern regarding "use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients."

24.    On October 6, 2006, OIG issued a letter noting:

> We are aware of an apparent proliferation of physician investments in medical device and distribution entities, including group purchasing organizations. Given the strong potential for improper inducements between and among the physician investors, the entities, device vendors, and device purchasers, we believe these ventures should be closely scrutinized under the fraud and abuse laws.

25.    On March 26, 2013, OIG issued a Special Fraud Alert regarding Physician-Owned Entities. The alert expressed several concerns regarding PODs, including that "the financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the devices the PODs sell in lieu of other, potentially more clinically appropriate, devices." With respect to the AKS, OIG noted its concerns were magnified when there are relatively few PODs ("such that the volume or value of a particular physician-owner's recommendations or referrals closely correlates to that physician-owner's return on investment") and where investment in a POD results in an alteration of a medical practice. The alert concluded that "PODs are inherently suspect under the anti-kickback statute."

26.    On April 25, 2022, OIG issued Advisory Opinion 22-07 noting its "longstanding concerns" regarding PODs and identifying suspect characteristics that potentially raise fraud and abuse concerns. In addition, OIG has repeatedly expressed concerns regarding abusive practices by salespersons who are independent contractors. *See generally United States v. Mallory*, 988 F.3d 730, 738 (4th Cir. 2021).

### D.    The Medicare Statute and Medicare Program

27.    In 1965, Congress enacted Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. § 1395 *et seq.*, to provide health insurance coverage for people 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426a.

28.    Medicare is administrated by CMS, which is part of HHS. At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

29.    Medicare provides coverage for items and services that are reasonable and necessary to diagnose or treat an illness or injury or to improve a malformed body member. Payment will be provided if medical necessity can be substantiated. Section 1862(a)(1) of the Social Security Act. CMS Manual System, Pub. 100-02, Medicare Benefit Policy Manual, Ch. 16, sec. 20 (the "Manual").

30.    The Medicare Program consists of four parts: A, B, C, and D. As alleged herein, Defendants submitted, or caused to be submitted, false claims under Medicare Part B.

#### i.    *Medicare Enrollment, Claims, and Coding*

31.    For a health care provider to seek reimbursement from the Medicare Program, the provider must obtain a National Provider Identifier ("NPI") from CMS. The provider also must submit an enrollment application.

32.    Once the provider is enrolled, the provider may submit bills to the Medicare Program for services rendered to the patients. A participating provider must properly document in the patient's medical record the service or procedure performed.

42 C.F.R. § 431.107(b)(1).

33.    Medicare only pays for Part B services that are actually rendered and are reasonable and medically necessary. 42 U.S.C. § 1395y(a). Part B providers must certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1).

34.    To obtain reimbursement from the Medicare Program, providers submit a claim form, which is typically done electronically. In particular, providers submit CMS Form 1500 and/or its equivalent, known as the 837P form, which contains the following certifications:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate, and complete; 2) I have familiarized myself with all applicable laws, regulations and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self- Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were incident to my professional service by my employee under my direct supervisor, except as otherwise permitted by Medicare or TRICARE . . . .
>
> NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by the form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

35.    Among the information the provider includes on a CMS 1500 or 837P form are certain five-digit codes, including CPT and Healthcare Common Procedure Coding System ("HCPCS") codes, that identify the diagnosis, services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source." 45 C.F.R. § 162.1002(a)-(b); Medicare Claims Processing Manual, Ch. 23, § 20.7 *et seq.*

36.     Providing accurate CPT and HCPCS codes on claims submission forms is material to and a condition of payment for the Medicare Program. *See, e.g.*, Medicare Learning Network Fact Sheet, Medicare Billing: 837P and Form CMS-1500 (requiring certification that "the services on this form were medically necessary").

37.     Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

38.     Generally, once a provider submits CMS Form 1500 or the 837B Form to Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

39.     The Medicare Program routinely denies payment to providers who bill for codes when the criteria for those codes is not actually met, including when the services are not performed or are not medically necessary.

ii.     *Medicare Part B – Limited Drug Coverage*

40.     Medicare excludes coverage for items and services that are "not reasonable and necessary." *See* 42 U.S.C. § 1395y(a)(1)(A).

41.     Medicare Part B covers medically necessary services, including provider visits, diagnostic tools that meet accepted standards for medical practice, procedures, medical supplies and durable medical equipment.

42.     "The Medicare program provides limited benefits for outpatient drugs." Manual, Ch. 15 § 50. In particular, Medicare Part B covers "medical and other health services," 42 U.S.C. § 1395k(a)(2)(B), including "services and supplies (including drugs and biologicals which are not usually self-administered by the patient) furnished as an

incident to a physician's professional service, of kinds which are commonly furnished in physicians' offices and are commonly either rendered without charge or included in the physicians' bills . . . ." *id*. § 1395x(s)(2)(A).

43.    Generally, Medicare Part B only covers drugs and biologicals if all requirements are met, including that they "meet the definition of drugs or biologicals," "are of the type that are not usually self-administered," "meet all the general requirements for coverage of items as incident to a physician's services," and "are reasonable and necessary for the diagnosis or treatment of the illness or injury for which they are administered according to accepted standards of medical practice." Manual, Ch. 15 § 50; *see also* 42 C.F.R. §§ 410.26. 410.29.

44.    Examples of Part B covered drugs include prescription drugs infused through durable medical equipment, some antigens, and injectable osteoporosis drugs under certain conditions. *See* https://www.medicare.gov/coverage/ prescription-drugs-outpatient; 68 Fed. Reg. 50428, 50428–50429 (August 20, 2003).

45.    The Medicare statute, with certain exceptions not relevant here, defines covered drugs and biologicals based on whether they are approved by certain hospital committees or listed in authoritative sources known as compendia:

> The term "drugs" and the term "biologicals" ... include only such drugs (including contrast agents) and biologicals, respectively, as are included (or approved for inclusion) in the United States Pharmacopoeia, the National Formulary, or the United States Homeopathic Pharmacopoeia, or in New Drugs or Accepted Dental Remedies (except for any drugs and biologicals unfavorably evaluated therein), or as are approved by the pharmacy and drug therapeutics committee (or equivalent committee) of the medical staff of the hospital furnishing such drugs and biologicals for use in such hospital.

42 U.S.C. § 1395x(t)(1). Inclusion in such a reference is a necessary, but not a sufficient condition for coverage. *See* Manual, Ch. 15 § 50.1. A product must "also meet all other

program requirements to be determined to be a drug or biological." *Id.*

46.     Under the Manual, "[m]edication given by injection (parenterally) is not covered if standard medical practice indicates that the administration of the medication by mouth (orally) is effective and is an accepted or preferred method of administration." Manual, Ch. 15 § 50.4.3. If a drug is available in both oral and injectable forms, "the injectable form of the drug must be medically reasonable and necessary as compared to using the oral form." *Id.* § 50.2.

47.     The Manual will, "[a]bsent evidence to the contrary, presume that drugs delivered by subcutaneous injection are self-administered by the patient." *Id.*, Ch. 15, § 50.1.

48.     The Manual includes examples when medications are not reasonable and necessary, noting that "[c]harges for medications, e.g., vitamins, given simply for the general good and welfare of the patient and not as accepted therapies for a particular illness are excluded from coverage." Ch. 15, § 50.4.3. The Manual further limits coverage for excessive medications:

> Medications administered for treatment of a disease and which exceed the frequency or duration of injections indicated by accepted standards of medical practice are not covered. For example, the accepted standard of medical practice in the maintenance treatment of pernicious anemia is one vitamin B-12 injection per month. A/B MACs (B) exclude the entire charge for injections given in excess of this frequency unless there are special medical circumstances that justify additional injections.

*Id.*

49.     The Manual also instructs Medicare contractors to "deny coverage for drugs and biologicals, which have not received final marketing approval by the FDA unless it receives instructions from CMS to the contrary." Ch. 15, § 50.4.1.

i. *Medicare Part B Does Not Cover Illegally Compounded Drugs*

50.    According to the United States Food and Drug Administration ("FDA"), "Drug compounding is often regarded as the process of combining, mixing, or altering ingredients to create a medication tailored to the needs of an individual patient. Compounding includes the combining of two or more drugs. Compounded drugs are not FDA-approved." *See* https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers. *See also* 21 U.S.C. § 353a (compounding is "for an identified individual patient based on the receipt of a valid prescription order or a notation").

51.    The FDA notes that "Compounding commonly occurs in pharmacies, although it may also occur in other settings. Federal law addresses compounding by a licensed pharmacist in a state-licensed pharmacy, or federal facility, or by a physician, as well as compounding by or under the direct supervision of a licensed pharmacist in an outsourcing facility." *See* https://www.fda.gov/drugs/human-drug-compounding/compounding-and-fda-questions-and-answers.

52.    "By compounding drugs on a large scale, a company may be operating as a drug manufacturer within the meaning of the [Federal Food, Drug, and Cosmetic Act (FFDCA)], without complying with requirements of that law. Such companies may be manufacturing drugs, which are subject to the new drug application (NDA) requirements of the FFDCA, but for which FDA has not approved an NDA or which are misbranded or adulterated." Manual, Ch. 15 § 50.4.7.

53.    "Section 1862(a)(1)(A) of the Act requires that drugs must be reasonable and necessary in order to by covered under Medicare. This means, in the case of drugs, the FDA must approve them for marketing. Section 50.4.1 instructs carriers and

intermediaries to deny coverage for drugs that have not received final marketing approval by the FDA, unless instructed otherwise by CMS. The Medicare Benefit Policy Manual, Chapter 16, "General Exclusions from Coverage," §180, instructs carriers to deny coverage of services related to the use of noncovered drugs as well." Manual, Ch. 15 § 50.4.7.

54.     "In those cases in which the FDA has determined that a company is producing compounded drugs in violation of the FFDCA, Medicare does not pay for the drugs because they do not meet the FDA approval requirements of the Medicare program." Manual, Ch. 15 § 50.4.7.

### E.    TRICARE

55.     TRICARE is a program of medical benefits provided by the United States Government, under public law to specified categories of individuals who are qualified for these benefits by virtue of their relationship to one of the seven Uniformed Services. The funds used by TRICARE to pay medical claims of qualified individuals are appropriated funds. 32 C.F.R. § 199.1(e).

56.     The Director of DHA is responsible for the TRICARE program. The Director has delegate authority for making such arrangements as are necessary to adjudicate and process claims. *Id.* 199.1(f). In providing civilian healthcare for its beneficiaries, TRICARE contracts claims adjudication/processing from civilian providers through Managed Care Support Contractors ("MCSCs"). 32 C.F.R. § 199.17(a)(1). The MCSCs negotiate special arrangements with civilian sector health care providers which are known as "network agreements."

57.     Healthcare providers, such as the Providers, are required to submit bills pursuant to their TRICARE contracts, using a claim form, CMS-1500, or the electronic equivalent (837P), when bills are presented electronically.

58.     In the instant case, the Defendants submitted or caused to be submitted CMS-1500, electronic claim forms, or institutional claim forms to a TRICARE contractor, which processed the claims for payment by TRICARE based on information provided by the Defendants.

59.     In general terms, the claim forms require the healthcare provider, and specific to this case, the Defendants, to submit bills using CPT codes, that identify the services rendered and for which reimbursement is sought, and the time consumed in rendering the services. The CPT codebook is published by the American Medical Association.

60.     The presentation of such claim form constitutes an assertion that the medical care has been rendered to eligible beneficiaries, that such care is in the nature of that represented by the billing codes appearing on the form, that the care was rendered by the individual indicated on the form to have provided the care, and that the services shown on the form were medically indicated and necessary for the health of the patient.

## V.     Violations of the FCA and AKS are Material to the United States' Payment Decisions

61.     Whether a claim submitted to Medicare or TRICARE is medically necessary is material to the United States' decision to pay that claim.

62.     As noted above, the CMS-1500, a Medicare claim form (that is also used for TRICARE claims), specifically requires a physician to sign, and in so doing affirming that, "In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete." The certifications of the CMS-1500 are further discussed in Paragraph 34, *supra*.

63.     Whether a claim to Medicare is tainted by an unlawful kickback is material

18

to the United States' decision to pay that claim.

64.    Congress has determined that, as a matter of law, claims that are tainted by violations of the AKS "constitute false or fraudulent" claims; and, thus whether a claim is tainted by an unlawful kickback is, as a matter of law, material to the United States' payment decision. 42 U.S.C. § 1320a-7b(g).

65.    Consistent with this requirement imposed by Congress, CMS has also made clear that violations of the AKS are material to the United States' payment decisions. For example, the CMS 1500 includes an express certification from the party submitting the claim that "the claim . . . complies with . . . the Federal anti-kickback statute."

66.    The materiality of AKS violations to Medicare payment decisions is consistent with the fact that the AKS is a criminal statute specifically targeted at preventing healthcare fraud in the context of federal health care programs such as Medicare.

## VI.    FACTUAL BACKGROUND

### A.    The Sanexas Device and 510k Clearance

67.    Sanexas is an electric stimulation device marketed by RST to treat various forms of pain and other medical conditions. Sanexas consists of a large central unit and electrical leads that are temporarily affixed to the area being treated, as depicted below. Treatment times generally last approximately 30 to 40 minutes.



68.     The FDA cleared Sanexas as substantially equivalent to a transcutaneous electrical nerve stimulator ("TENS") on or around January 24, 2003 under Section 510(k) of the Food, Drug and Cosmetic Act. Sanexas did not receive Premarket Approval from FDA and is not FDA "approved."

69.     Sanexas is FDA cleared for certain specified indications for "electromedical treatment" relating to "pain management" and "muscle stimulation."

70.     Sanexas is not FDA cleared for healing or regrowing nerves. Sanexas is also not cleared for treating neuropathy.

71.     Sanexas is not FDA cleared to be used in conjunction with nerve blocks or vitamin injections.

72.     Nevertheless, on October 21, 2018, Glickert sent a text message to Novof stating that "[t]here are weight loss protocols, addiction protocols, TMJ, ptsd, depression, Bell's palsy, fucking everything!!" Novof testified he was skeptical of Glickert's claims and "scoffed" at the idea that the Sanexas device could be used to treat all of these

conditions.

73.    According to the 510(k) summary for Sanexas, "there is no difference in technological characteristics between this device and the predicate device." The predicate device listed is the "ProElecDT," which was marketed by Matrix Electromedical, Inc., a predecessor to RST.

74.    The ProElecDT was at one point marketed by a German company called Hako-Med, and the terms ProElecDT and Hako-Med are used interchangeably in the industry and herein when referring to the same device.

### B.    September 2018: The Providers Purchase the Sanexas Device

75.    In or around September 2018, Novof and Glickert discussed whether to purchase Sanexas device, and ultimately agreed that it would make a good investment and to move forward.

76.    In December 2018, Novof signed a "Promissory Note" with RST, whereby Novof promised to pay RST $70,000 over time for the purchase of two additional Sanexas devices.

77.    Glickert filed a declaration in the *Vanguard* action (see *infra* ¶ 290), dated May 12, 2021, which stats that, in total, Vanguard "invested approximately $200,000 to purchase five Sanexas devices." *See The Vanguard Clinic, LLC v. Nat'l Billing Institute, LLC*, 20-CV-11234 (C.D. Cal.), ECF No. 48-1 (the "Glickert Decl."), attached hereto as Exhibit 2.

78.    The following table summarizes Glickert and Novof's purchases of devices for use in Vanguard that performed services billed to Medicare:

| Date of Purchase | Purchase Amount | Machine Type |
| --- | --- | --- |
| 9/13/2018 | $42,995 | Sanexas |
| 12/20/2018 | $44,995 | Sanexas |
| Jan. 2019 | Approximately $40,000-45,000 | Sanexas |
| March/April 2019 | $32,500 | TM Flow |
| 6/6/2019 | $40,545 | Sanexas |
| 10/3/2019 | $38,450 | Sanexas |

79.     The day after purchasing their first Sanexas device, the Providers engaged NBI as their medical biller.

80.     Defendants' purchases of the Sanexas and TM Flow devices were significant capital expenses. Defendants purchased these devices with the goal of generating a profit by successfully billing Medicare and TRICARE for Sanexas treatment and vitamin injections, along with ancillary TM Flow and ENFD testing.

81.     In light of their equity investments in Vanguard and FDL, Novof and Glickert stood to gain from the companies' profits and, in fact, received distributions from Vanguard and FDL.

**C.     The Providers' Protocol for Sanexas Treatment**

82.     Prior to September 2018, the Providers offered traditional chiropractic services, as well as various products and services for which patients would pay cash or use private insurance. One such service used the HakoMed electronic stimulation device, for which most patients paid in cash per visit.

83.     Glickert describes the HakoMed in a December 19, 2018 text message to a

chiropractor based in Wisconsin, known to the parties as M.J.: "[RST Director] invented the Hakomed with Hans. He told me the last update to HakoMed was 1997. This thing is now being updated and they're trying to figure out a way to include lasers in addition to the machine. It's crazy."

84.    The Providers principally offered Sanexas treatment for patients suffering from neuropathy, as well as various other forms of acute and chronic pain.

85.    Patients at Vanguard received treatment on an outpatient basis and typically received two treatments per week for twelve weeks, for a total of approximately 24 treatments. Treatment times generally lasted approximately 30 to 40 minutes.

86.    The Providers offered a 24-treatment regimen to patients to order to bill the maximum amount possible to insurance companies, most of which refused to reimburse additional visits. On January 7, 2020, Glickert emailed a provider that: "Most patients are done at 24 because we can't find a solid reason to justify continuing treatments. Also, most insurance companies will only allow 18-24 total visits before they'll shut down care."

87.    Once Vanguard staff had placed the electrical leads on a patient and initiated the 30 to 40-minute electric stimulation protocol, it was not necessary for staff to remain one-on-one with the patient. In practice, the Providers' nurse practitioner ("NP") did not remain one-on-one with patients for the entire time they received Sanexas treatment.

**D.    The Providers' Protocol for Vitamin Injections and Development of the "Glickert Blend"**

88.    Beginning in October 2018, the Providers began purchasing the "OMS Blend" from RST.

89.    The OMS Blend was developed and manufactured by a doctor associated

with RST (known to the parties as R.M.) and consisted of various over-the-counter vitamins and minerals ingredients, as well as Chinese herbs, that were heavily diluted in a solution.

90.    The Providers billed the OMS Blend to Medicare. Medicare reimbursement for the blend was highly profitable and accounted for more than half of the reimbursements per patient visit (the remainder being Sanexas treatment and other ancillary services).

91.    According to the Mayo Clinic, Lidocaine and Marcaine are local anesthetics that prevent pain by blocking the signals at nerve endings under the skin. https://www.mayoclinic.org/drugs-supplements/lidocaine-topical-application-route/description/drg-20072776#:~:text=Lidocaine%20belongs%20to%20the%20family,do%20when%20used%20for%20surgery; https://www.mayoclinic.org/drugs-supplements/bupivacaine-injection-route/side-effects/drg-20406723?p=1.

92.    The Providers' NP mixed the OMS Blend into a base of Lidocaine or Marcaine (nerve blocks). Patients generally received between four to eight vitamin injections subcutaneously per the location receiving treatment.

93.    At some point in 2019, RST and R.M. stopped producing the "OMS Blend." As a result, Glickert developed his own vitamin blend, which came to be known in the industry as the "Glickert Blend."

94.    Glickert, a chiropractor, has no medical credentials or relevant pharmaceutical experience to support his ability to devise a formula for injection into the human body. Novof testified that Glickert lacks any credentials to select ingredients to be injected into the human body.

24

95.     Glickert selected some of the ingredients in the "Glickert Blend" based on obtaining reimbursements and insurance.

96.     In April 2019, Glickert sent text messages to RST complaining about side effects that patients have been suffering from the vitamin blend, including a burning sensation. Glickert notes: "1% lidocaine is extremely dangerous for patients. We don't feel comfortable injecting their feet and then expecting them to drive home without any feeling…" Glickert ultimately informs RST that "I'm going to make my own blend. I can get products cheaper from other pharmacies." Glickert notes that he does not have the NDC numbers from the existing blend, and that "I'm doing lots of research right now. Might be able to come up with my own blend that is made in the clinic out of several individual vials. Hopefully with enough research I can get costs down low per patient and solve this issue."

97.     On May 6, 2019, Glickert emailed RST a "solid group of items to include in the New(est) Blend" that he had been "working hard on putting [] together." Glickert explained that each item would be combined in "an IV bag of Sterile water with Lidocaine/Marcaine." Glickert includes a list of ingredients, which is similar to the list of ingredients that he ultimately used. *See infra* ¶¶ 108-09. Glickert notes that hopefully "we'll have something that everything is comfortable with as a far as patient outcomes AND reimbursable by Medicare and major medical." (emphasis in original).

98.     According to the U.S. Drug Enforcement Administration, ketamine is a "dissociative anesthetic that has some hallucinogenic effects. It distorts perceptions of sight and sound and makes the user feel disconnected and not in control."

99.     Nevertheless, on May 6, 2019, Glickert emails NBI and suggests adding "a tiny amount of ketamine" to the vitamin blend so that the blend would be perceived as a

"pharmaceutical" and be more likely to be covered by insurance. NBI responds: "It's up to you, I don't know that is has to be all vitamins' because in reality it isn't with lidocaine anyway! If you think it would help, then I am for it. My only thought would be could it be at all considered then a nerve block." Glickert replies that Novof does not want to add ketamine at this time.

100.    Although the Glickert Blend was not an FDA approved drug, Glickert used variations of the term "pharmaceutical" to describe the blend to mislead insurance companies and increase the likelihood of insurance coverage. For example, on May 6, 2019, Glickert emails NBI: "My idea was to change the words 'Pharma-nutrients' to 'Nutri-Pharmaceuticals'. [M]aybe having the full word pharmaceuticals in there would help more?"

101.    Similarly, On May 13, 2019, Glickert sent a text message to RST, which states:  "Sending you a Letter of Medical Necessity that I created for [NBI]. We're having some problems with denials and we're going to have every patient get one of these on their initial H&P [history and physical examination]." In response, RST asks "What's nutria-pharmaceutical vs. pharmaceutical blend?" Glickert responds: "I liked the word 'pharmaceutical' in there. Seems more like a medication injection rather than a vitamin injection. Either way I'm fine with whatever one gets paid!" Glickert then remarks: "I'm good with either one. If we like pharmanutrient better that can be used. My thought is that by using the word 'pharmaceutical' then less reviewers would deny the claims." (emphasis added).

102.    Lacking any credentials or experience in the development of pharmaceutical products, Glickert resorted to using his staff and patients as guinea pigs. On May 30, 2019, Glickert sent a text message to RST stating, "We have a cold-stable

version with correct NDC numbers and it doesn't burn patients. We've experimented on ourselves and are now using it on patients today."

103.    On June 20, 2019, Novof sent a text message to Glickert asking if they could "copyright or trademark the blend and sell it under the Vanguard clinic name."

104.    On September 19, 2019, Glickert sent a text message to M.J.: "I looked at methylcobalamine. Cyano is paid by Medicare. Methyl is not. Also, as a liquid, methyl is very unstable. In response to M.J.'s question about how much Medicare reimburses cyanocobalamin, Glickert responds:  "I think a few bucks. But because Medicare pays; insurance pays."

105.    On or before September 19, 2019, Defendants distributed a "how to" document they had developed that describes the "steps to prepare vitamin blend bag." The document describes mixing all the ingredients into a single "bag of sterile water" and then drawing individual syringes from the bag for treating patients. Defendants and NBI distributed this document to providers nationwide.

106.    The Providers engaged EBM Pharmacy to manufacture the Glickert Blend and notified other Sanexas users that they could purchase the Glickert Blend directly from EBM Pharmacy.

107.    On September 8, 2019, Glickert sent a text message to M.J.:  "One of the reasons I wanted [EBM] to source all the products is because I'll make about 5% of the sales."

108.    The "TX Fibro" private message board is hosted by M.J. and, during the relevant time, included approximately 300 members, many of which were chiropractors and podiatrists that owned and operated integrated clinics.

109.    On September 18, 2019, Glickert creates a topic on the TX Fibro message

board titled, "Sanexas Vitamin Blend Ordering." Glickert identifies the ingredients in the blend, along with their NDC codes, and describes how to make the blend. Glickert also discusses the cost of the blend: "These items have been carefully sourced based on the reimbursable J-Code AND the NDC. If you think you can find the product cheaper somewhere - BE SURE TO CHECK THE NDC! If you find a cheaper product and the NDC doesn't match billing - YOU'RE COMMITTING FRAUD! In an audit - you will absolutely lose. If you want to make adjustments to the blend, OR if you want to source new products, be sure to run it by myself and/or [M.E.] at National Billing." (emphasis in original).

110.    On October 9, 2019, EBM Pharmacy emails RST and Glickert the structure of commissions based on sales of the Glickert Blend, which provided for Glickert to receive larger kickbacks based on sales of the Glickert blend to Defendants' customers: "1. If F20 (Glickert's Blend) is purchased by a provider that is under the Sanexas Distributorship (D69) then D69 will make $75 and D77 will make $25. If F20 (Glickert's Blend) is purchased by a provider that is under the Glickert Distributorship (D77) then D77 will make $75 and D69 will make $25."

111.    On October 14, 2019, Glickert sent a text message to M.J. that the "cost of an injection is less than two dollars per location."

112.    On October 31, 2019, Glickert emailed a provider: "We've never been able to understand how to do testing with the blend and its 'potency'. If you know of a way - I'm all ears."

113.    On November 15, 2019, Glickert sent a text message to RST concerning kickbacks from vitamin blend sales: "I've heard from several doctors that you're still upset with me over the blend. Upsetting you is not worth the dollars that I make when a doctor buys a package from [EBM]. I called [EBM] on Wednesday and told him that you should

get 100% of blend sales. I'm out of the blend business. A positive continued relationship is more important to me than the money."

### E.  The "Glickert Blend" Consists of Vitamins and Minerals that are Widely Available Over-The-Counter

114.  According to Vanguard's "Chronic Pain Protocol," which Defendants distributed widely to their customers, the ingredients in the "Glickert (or Vanguard)" blend are:

a.  Cyanocobalamin

b.  Thiamine HCL

c.  Vitamin-B Complex

d.  Pyridoxine HCL

e.  L-Carnitine

f.  Ascorbic Acid/Vitamin-C

g.  Alpha Lipoic Acid

h.  Trace Minerals (zinc sulfate heptahydrate, cupric sulfate, manganese sulfate, chromic chloride, selenious acid)

i.  Sodium Bicarbonate

j.  Lidocaine/Marcaine

k.  Sterile Water

115.  In fact, the active ingredients in the "Glickert Blend" are consumed as part of a normal diet and/or are widely available as over-the-counter supplements:

a.  Cyanocobalamin – Vitamin B12



b. Thiamine HCL – Vitamin B1



c. Vitamin-B Complex



d. Pyridoxine HCL – Vitamin B6



    e.  L-Carnitine



    f.  Ascorbic Acid/Vitamin-C



    g.  Alpha Lipoic Acid



h. Trace Minerals (zinc sulfate heptahydrate, cupric sulfate, manganese sulfate, chromic chloride, selenious acid)



i. Sodium Bicarbonate – Baking Soda



j. Lidocaine/Marcaine – Nerve Block



116.    Novof testified that the vast majority of the ingredients in the blend could be obtained through a normal diet or over-the-counter supplement.

**F.    Defendants' Collaboration with NBI to Promote Nationwide Sanexas Billing**

117.    On September 17, 2019, M.E. sent a text message to Glickert complaining that another NBI client was "bad mouthing [NBI] on the boards." M.E. asked Glickert to "respond on how great a job we do, how we get you paid." Glickert replied that he "took care of it."

118.    Also on September 18, 2019, Glickert sent a text message to M.E. stating, "I'll personally guarantee that you'll have at a minimum 2 dozen new clients by year's end." M.E. responds, "If [you] refer us that many wow! I'm going to need a bigger office . . . ."

119.    On September 18, 2019, Glickert sends a text message to M.E.: "You're doing great. Just get a new office because I spoke with a guy about to buy 4 systems, another guy that has 8 clinics in Virginia and one more doctor out of Oregon. They're all excited for [S]anexas." M.E. responds, "We are planning on it, we discussed it today."

120.    On September 15, 2019, Glickert sends a text message to M.E. referring a provider with the initials J.J. who has 8 clinics and who wanted to purchase 4 Sanexas devices from Vanguard.

121.    NBI collaborated with Defendants to jointly develop the "Statement of Medical Necessity" and/or "Certificate of Medical Necessity," as well as other billing, coding, and instructional documents for Sanexas. NBI and/or Defendants distributed these documents widely to their customers and on TX Fibro.

### G.    Medicare Part B Does Not Cover Sanexas and/or Vitamin Injections in the Manner in which the Providers Administered Them

   i.    *The applicable national and local coverage determinations exclude coverage for Defendants' Sanexas treatment and vitamin injection protocol*

122.    Participants in the Medicare program, such as Defendants, have a "duty to familiarize" themselves with the legal requirements for reimbursement. *Heckler v. Community Health Servs. Of Crawford*, 467 U.S. 51, 65 (1984); *see also id.* at 63 ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law[.]").

123.    Because the Providers were enrolled in Medicare, they are deemed to have constructive notice of the Medicare coverage determinations applicable to billing Sanexas treatment and ancillary services. *See Maximum Comfort, Inc. v. Sec'y of Health and Human Servs.*, 512 F.3d 1081, 1088 (9th Cir. 2007) ("Under Health and Human Services regulations, [supplier] is deemed to have constructive notice of manual issuances, bulletins, and other written guidelines and directives indicating that certain items of … will not be covered by Medicare.") (citing 42 C.F.R. § 411.406(e)).

124.    Defendants offered Sanexas electric nerve stimulation treatments on a continuing basis to patients for treatment of pain. However, National Coverage Determination ("NCD") 160.7.1, which was effective in June 2006, states: "Electrical nerve stimulation treatments furnished by a physician in his/her office, by a physical

34

therapist or outpatient clinic are excluded from coverage by § 1862(a)(1) of the Act." NCD 160.7.1 also notes that "it is inappropriate for a patient to visit his/her physician, physical therapist, or an outpatient clinic on a continuing basis for treatment of pain with electrical nerve stimulation."

125.    Novof testified that the Sanexas device was electronic stimulation treatment that was furnished in an outpatient clinic, and that patients complaining of pain would return for multiple treatments. Novof testified that, if he had seen NCD 16.7.1 at the time he would have been concerned and "did not realize there was language excluding this device."

126.    Similarly, the applicable Local Coverage Determination ("LCD") L35222 (effective 10/1/2015, rev'd 7/30/2020) states that "[t]he use of electrostimulation alone for the treatment of multiple neuropathies or peripheral neuropathies caused by underlying systemic diseases is not medically reasonable and necessary." LCD L35222 continues:

> At present, the literature and scientific evidence supporting the use of peripheral nerve blocks with or without the use of electrostimulation/electromagnetic stimulation, and the use of electrostimulation/ electromagnetic stimulation alone for neuropathies or peripheral neuropathies caused by underlying systemic diseases, is insufficient to warrant coverage. These procedures are considered investigational and are not eligible for coverage for the treatment of neuropathies or peripheral neuropathies caused by underlying systemic diseases.

*Id.*

127.    Novof testified that the purpose of Sanexas treatment was to "alleviate the pain associated with peripheral neuropathy."

128.    LCD L35222 defines "nerve blocks" as causing "the temporary interruption of conduction of impulses in peripheral nerves or nerve trunks by the injection of local

anesthetic agent(s) and/or steroid."

129.    The OMS and Glickert Blends are considered "nerve blocks" under LCD L35222 because they included a local anesthetic agent (Lidocaine or Marcaine). Novof testified that the anesthetic in the vitamin blend was "used for a nerve block."

130.    The "Utilization Guidelines" in L35222 note that, "[t]reatment protocols utilizing multiple injections per day on multiple days per week for the treatment of multiple neuropathies or peripheral neuropathies caused by underlying systemic diseases are not considered medically necessary." As noted above, the Providers' patients generally received multiple vitamin injections per day.

131.    In excluding coverage, L35222 identifies in its "Sources of Information" a study concerning Sanexas treatment and vitamin injections that was authored the inventor of Sanexas. *See* Odell RH, Sorgnard R, *New technique combines electrical and local anesthetic for pain management*: Practical Pain Management; June 2011: online at http://www.practicalpainmanagement.com>/issue/1106.

132.    Novof testified that, under the LCD, it was clear that there was no Medicare coverage for Sanexas treatment and vitamin injections. Novof further testified that, at present, he did not believe that Medicare covered Sanexas electrical stimulation treatment or vitamin injections used in connection with that treatment.

133.    Pursuant to the applicable NCD and LCD, Medicare Part B did not permit reimbursement of Sanexas or vitamin injections used in conjunction with Sanexas in the way in which Defendants administered them.

    ii.    *Defendants' vitamin injections do not fall under the limited Part B coverage for prescription drugs*

134.    Defendants' vitamin blend injections are not listed among the examples of

Part B covered drugs listed on Medicare's website. *See* https://www.medicare.gov/coverage/ prescription-drugs-outpatient.

135.    Vitamin blend injections used in conjunction with Sanexas treatment as the Providers administered them are neither reasonable nor necessary under the applicable NCDs and LCDs. *See* 42 U.S.C. § 1395y(a)(1)(A); *see supra* § VI.G.

136.    RST informed Defendants that vitamin injections were not necessary for use with Sanexas treatment. *See infra* ¶ 264.

137.    Defendants' vitamin blends are not commonly furnished in physicians' offices. *See* 42 U.S.C. § 1395x(s)(2)(A). To the contrary, Defendants' vitamin blends were developed specifically for use in conjunction with the Sanexas device, which is not widely available in physician offices. Novof testified that he was unaware of any physician office that carried the Glickert Blend.

138.    Defendants' vitamin blends have not received final marketing approval by the FDA, and CMS has not instructed its contractors to approve coverage for vitamin injections used in conjunction with Sanexas treatment. 42 U.S.C. § 1395x(t)(2)(B); Ch. 15, § 50.4.1.

139.    Defendants' vitamin blends do not meet the definition of "drugs or biologicals," because they are not included in any approved drug formulary or reference. 42 U.S.C. § 1395x(t)(1); Manual, Ch. 15 § 50.1.

140.    The ingredients in the vitamin blend mostly consist of vitamins and minerals that are consumed as part of a normal diet and/or are widely available via over-the-counter oral supplements. Defendants' vitamin blends fall under the exclusion for "vitamins, given simply for the general good and welfare of the patient and not as accepted therapies for a particular illness." Manual, Ch. 15, § 50.4.3.

141.   Defendants' vitamin blends were administered by subcutaneous injection, and are therefore of a type that is usually self-administered. 42 U.S.C. § 1395x(s)(2)(A); Manual, Ch. 15, § 50.1. Furthermore, standard medical practice indicates that vitamins may be swallowed in pill form (orally) rather than given by injection. Manual, Ch. 15 §§ 50.2, 50.4.3.

142.   Defendants' injection protocol falls under the Manual's exclusion of coverage for "[m]edications administered for treatment of a disease and which exceed the frequency or duration of injections indicated by accepted standards of medical practice." Manual Ch. 15, § 50.4.3.

143.   In sum, the vitamin injections fail to satisfy the statutory requirements for Part B coverage because they do not fall under the limited Part B benefits for outpatient prescription drugs, are not medically reasonable or necessary (42 U.S.C. § 1395y(a)(1)(A)), are not "commonly furnished in physicians' offices" (*id.* § 1395x(s)(2)(A)), are of a type that is usually self-administered (*id.*), are not FDA approved or included in any approved drug formulary or reference (*id.* § 1395x(t)(1)), fall under the exclusion for vitamins (Manual, Ch. 15 § 50.4.3), and were given excessively to patients (*id.*). Failure to satisfy any one of these conditions would be sufficient grounds for denying Medicare Part B coverage.

### iii.   *Medicare Part B Does Not Cover Defendants' Illegally Compounded Vitamin Blends*

144.   The Vanguard Clinic was a chiropractic office that was not under the supervision of a licensed pharmacist and did not have a license to manufacture drugs.

145.   The OMS and Glickert Blend were compounded daily in large batches at Vanguard according to a predetermined recipe. Accordingly, the OMS blend and "Glickert

Blend" were not compounded to fit the medical needs of any individual patient, but were instead illegally compounded on a large scale.

146.    On October 30, 2019, Glickert emailed a provider: "If you mix it exactly like I do, then we can use one bag on 70 injection sites. An 'injection site' is defined as 4mL of blend into a body part. Most patients are 2 injection sites. Which means we can treat approximately 35 patients with one bag. We see anywhere between 25-35 patients per day, so we'll go through a bag each day. If we have a light day, we might keep it refrigerated overnight, but really won't use it past noon the next day."

147.    Glickert was aware that the "Glickert Blend" could not be considered a properly compounded drug. On April 30, 2019, a consultant emailed Glickert and advised that, "Compounded drugs are used to meet the special needs of a patient."

148.    Similarly, Novof testified that there was no single individual patient for whom the Glickert Blend was compounded.

149.    Because Medicare Part B does not pay for compounded drugs that have been produced in violation of the FFDCA, there was no coverage for the vitamin blends that Defendants illegally compounded.

## H.    Defendants Used Improper Billing Codes in Conjunction with Sanexas Treatment and Vitamin Injections

150.    The various billing codes that Defendants used are improper for the way in which Defendants administered Sanexas treatment and vitamin injections.

151.    CPT Code 97016 applies to vasopneumatic devices used for lymphedema treatment. The Sanexas device, however, is not FDA cleared for lymphedema treatment. In addition, the suction cups on the Sanexas device are not considered pneumatic compression devices under the applicable NCD, because they are not inflatable garments.

*See* NCD 280.6 ("Pneumatic compression devices consist of an inflatable garment for the arm or leg and an electrical pneumatic pump that fills the garment with compressed air. The garment is intermittently inflated and deflated with cycle times and pressures that vary between devices.") (eff. 1/14/2002).

152.    CPT Codes 97032, 97110, and 97112 require direct one-on-one patient contact (constant attendance). However, The Providers did not provide direct one-on-one patient contact during the course of Sanexas treatments, nor is direct one-on-one patient contact necessary once the Sanexas protocol is running.

153.    CPT Code 97150 requires therapeutic services provided to a group of two or more people at the same time. Examples include water therapy, conditioning therapy, or exercise therapy with the constant presence of a doctor or licensed therapist, but not in individual contact with an individual patient. The presence of multiple patients in the same room that are simultaneously receiving electric stimulation, however, does not constitute group therapy. In addition, a doctor or licensed therapist was not present while patients received Sanexas treatment, and the nurse that administered Sanexas treatment did not need to remain in the room while the protocol was running.

154.    A Local Coverage Article excludes coverage for certain of these codes when used for electric stimulation and/or nerve blocks. *See* A56731 (complementing LCD L37642 and noting that "[u]se of Physical Medicine and Rehabilitation CPT/HCPCS Codes (97032, 97139, G0282, G0283) for" nerve blocks and electrostimulation for neuropathy is "inappropriate").

### I.    The Providers' False Billing of Epidermal Nerve Fiber Density ("ENFD") Testing

155.    From March 27, 2019 through May 28, 2020, Vanguard billed Medicare

40

Part B for 70 claims related to ENFD testing, for which it was paid $4,539.46. The CPT and HCPCS codes billed to Medicare Part B for ENFD testing were 11104 and 11105.

156.    The Providers' ENFD testing involved performing a punch biopsy on patients to purportedly evaluate nerve damage that could be treated with Sanexas. The Providers also offered ENFD testing after Sanexas treatment to purportedly evaluate whether nerve health had improved.

157.    It is not medically reasonable or necessary to conduct ENFD testing to see if a patient could benefit from Sanexas treatment, which is not covered by Medicare in the manner that Vanguard administered it.

158.    Because Sanexas treatment is not cleared for healing or regrowing nerves, it is not medically necessary or reasonable to perform nerve biopsies to see if a patient could benefit from Sanexas treatment.

159.    There is no Medicare Part B coverage to conduct medically unnecessary tests that lack clinical value.

160.    The Providers' ENFD testing were medically unnecessary and lacked clinical value, because Vanguard patients received Sanexas treatment regardless of the results of ENFD testing. Indeed, Vanguard patients began receiving Sanexas treatment on or shortly after their first consultation – *well before* receiving their biopsy results several weeks later.

161.    On September 16, 2020, Glickert sends a text message to a provider noting, "You don't need to wait for punch biopsy to return to start care. Some clinics do though."

162.    Novof testified that he did not know how ENFD testing was medically useful when patients received Sanexas treatment before the results of the testing were received.

163.    Advanced Pathology Solutions ("APS") interpreted the ENFD tests for

41

Vanguard.

164.    The Providers were also aware that ENFD testing lacked clinical value, because it delivered inaccurate or unreliable results. On October 4, 2019, Glickert emails APS and writes: "I've been speaking with [our NP] regarding the recent consistency of ENFD results that APS has been providing us. We've noticed that results are taking longer and longer to get back. We've also noticed that the results we are seeing are starting to drop. We've had several patient's repeat biopsies come back WORSE than when they started but have all subjectively stated great improvement."

165.    Likewise, on October 30, 2019, Vanguard's NP emails Glickert a medical journal article titled, "Improving diagnostic accuracy of skin biopsies." The NP writes: "Trying to find some info to explain the inaccuracies so I am not calling the patient and saying 'The fed-ex guy must have left it in the sun too long' as the reason pathology gave me why it's worse than before, even though he is feeling so much better." Glickert responds:  "Yeah, its super frustrating! When they talk about it - it seems like this is a fantastic test which will result in validation of care and proof of improvements! And then, it comes back meh."

166.    The Providers did not offer ENFD testing for the benefit of their patients, but rather to maximize reimbursements and attempt to validate Sanexas treatment in the event of an audit. On January 9, 2020, Glickert responds to a post on TX Fibro titled, "Bundling w/ MC [Medicare]." Glickert explained:

> Listen - the 'money' is in the patient getting the Sanexas treatments. It's not in the exams and testing!
>
> Do what you need to do to validate care with your testing; exams, Toronto, TM-Flow, DND, ENFD... We don't do those to get paid on them (although we do), we do those in the event someone comes sniffing around asking questions. We need that data to support and validate what we do - not to

drive revenue. <u>We want to get patients onto treatments as fast as we can</u>. If you have a long drawn out process of testing just so you can make a few extra bucks, you're going to lose more patients than you'll ever know. We used to have a 3 day process - we lost a percentage of patients due to NOT starting something. We chased ~$300 but we lost ~$3,000+ because we wanted to make some extra money.

We do this;
Day 1: Consult -> Exam, TM-Flow. If TM-Flow is normal or relatively normal, we do ENFD.
Day 2: ROF and Sanexas. If patient elects for HCTP, we do that on Day 2 and start Sanexas Day 3

(emphasis added).

167.    On March 18, 2021, Glickert responded to a post on TX Fibro titled, "ENFD..Dave Harless...Bako vs. APS 3/22/21," and expressed his preference that APS's reports noted that "NeoGEN/Sanexas devices are suggested/recommended as a treatment option."

168.    Patients experienced pain while undergoing the punch biopsy used for ENFD testing. Accordingly, some patients declined a second punch biopsy, which meant that there was no way to test the purported "before and after" improvement in nerve health from using the Sanexas device.

169.    There are approximately 28 Vanguard patients that received punch biopsies (W.B., K.H., M.T, B.N, R.D., L.L., W.F., M.F., A.M., M.M., M.B., K.M, R.B., M.P, R.T., W.F, M.R., LS., W.D., F.I., F.R., C.M., L.C., J.G., W.F., D.H., E.W., L.B.). Only approximately 8 patients (K.H., W.F., M.F., R.B., M.P., W.F., L.S., J.G.) received a second punch biopsy. Nearly all of these patients received Sanexas treatment and/or vitamin injections on the same visit as their initial punch biopsy.

**J.    The Providers' False Billing of "TM Flow" Testing**

170.    From October 29, 2019 through February 4, 2020, Vanguard billed

43

Medicare Part B for 75 claims related to TM Flow testing, for which it was paid $1,406.29. The CPT and HCPCS codes billed to Medicare Part B for TM Flow testing were 95921, 95923, and 95943.

171.    The TM Flow System ("TM Flow") is combination of hardware and proprietary software that acts as a medical device data system and is manufactured by LD Technology. TM Flow performs various autonomic nervous system ("ANS") and vascular function assessments.

172.    The Providers offered TM Flow to screen new patients for various diseases, which, if identified, purportedly could support the need for Sanexas treatment.

173.    Under the applicable LCD, however, "[s]yndromes of autonomic dysfunction which require formal autonomic function testing are relatively rare." *See* L35124.

174.    The applicable LCD includes six (6) limitations that render ANS testing not medically reasonable and necessary and not covered, including "screening patients without signs or symptoms of autonomic dysfunction" and for "[t]esting results that are not used in clinical decision-making or patient management." *See* L35124.

175.    Nevertheless, the Providers offered ANS testing using TM Flow to screen patients during an initial visit and routinely offered Sanexas treatment regardless of the results of TM Flow testing.

176.    The limitations in the applicable LCD also include stringent requirements concerning the necessary training and certification to conduct ANS testing:

> Testing performed by physicians who do not have evidence of training, and expertise to perform and interpret these tests. (Physicians must have knowledge, training, and expertise to perform and interpret these tests, and to assess and train personnel working with them. This training and expertise must have been acquired within the framework of an accredited

residency and/or fellowship program or must reflect extensive continued medical education activities. If these skills have been acquired by way of continued medical education, the courses must be comprehensive, offered, sponsored or endorsed by an academic [institution] in the United States and/or by the applicable specialty/subspecialty society in the United States, and designated by the American Medical Association (AMA) as category I credit.)

*See* L35124.

177.    The TM Flow tests at Vanguard were not administered by physicians.

178.    There are only approximately 61 medical doctors in the country certified in Autonomic Disorders by the United Council for Neurologic Subspecialties.

179.    The Providers lacked the necessary training and certifications to conduct ANS testing under the applicable LCD.

180.    Certain equipment, such as a tilt table, is also necessary to conduct ANS testing. *See* L35124. Nevertheless, on October 6, 2019, M.J. created a topic on TX Fibro titled, "TM Flow…How it Proves Medical Necessity!" In response to a question from a provider regarding whether a special table was necessary, Glickert wrote: "We use an exam table. Nothing fancy."

181.    In addition, because Medicare Part B did not cover Sanexas treatment in the manner in which Defendants used it, it was not medically reasonable or necessary to conduct TM Flow testing ancillary to Sanexas treatment.

182.    On April 25, 2019, Glickert sends a text message to Novof, stating: "Confirmed with billing on reimbursements for TM Flow. [NBI] said the CPT codes will reimburse a minimum of $200, probably much more from Medicare….$32,500/$200 = 163 tests. Should have that in 3 months, if not 2 with current patient base and new patient flow." Novof responds, "Sweet. Is it ordered." Novof testified that Glickert's calculations were based on *minimum* Medicare reimbursements, but that he hoped to be reimbursed

at a much higher rate by Medicare. Novof further testified that they hoped to offset the cost of the TM Flow device in less than 163 tests.

183.    On June 26, 2019, Glickert and RST discuss the various billing codes (95951, 95923, 93922) that could be used for TM Flow. Glickert also notes that he has "some ideas typed up on how the phrasing in the H&P [history and physical examination] should read when ordering the TM-FLOW. I'll get those sent over tomorrow."

184.    On October 10, 2019, an NP for Vanguard emails Novof and Glickert and notes that "we've had significant issues with APS labs who does the punch biopsy reports." The NP notes that a colleague "no longer uses APS and thinks ENFD on every patient is overkill - she does TM Flow on everyone, then will only do ENFD punch biopsy if the patient's TM Flow is normal, which makes sense. What are your thoughts?" Novof responds: "I've been meaning to mention that I don't need to sign every Sanexas treatment, just the initial exams and procedures so what your writing makes sense. We can have standing orders and Selma can document with no further paperwork (oversight.) The TM Flow on every patient with normal findings requiring ENFD would be a better way to workup patients." Glickert then replies:  I've told the staff that we'll change...: Day 1: Consult and Exam. Day 2: TM-Flow, if patient has normal TM-Flow then move to ENFD. Day 3: Review TM-Flow and start 1st Sanexas treatment."

185.    On October 21, 2019, M.J. messages Glickert to ask whether he should block off an hour for a NP to perform an exam. Glickert remarks that his NP's exam takes "[a]bout 20 minutes and then charting/notes...A quick Toronto and some basic medical stuff is sufficient." Because Glickert believed that only a normal physical examination was needed before Sanexas treatment, performing TM Flow testing and ENFD testing was not medically reasonable or necessary.

186.   Of the 25 patients that received TM Flow testing, *all* returning patients received Sanexas treatment on a subsequent visit.[1]  Accordingly, the TM Flow results lacked clinical value and merely confirmed existing Defendants' scheme to put as many patients as possible on a Sanexas treatment plan.

### K.    The Providers' Marketing of Sanexas and Medicare Coverage

187.   On September 12-14, 2019, the Providers hosted a Sanexas conference at Vanguard, which was called "Meet me in St. Louis." Approximately 40 people attended, including RST and NBI. In particular, NBI participated in a seminar during the conference.

188.   On October 14, 2019, Glickert appeared on a paid segment for KMOV St. Louis, which was published on YouTube. *See* https://www.youtube.com/watch?v=LhdqxHYb-E0. Glickert discusses patients suffering from neuropathy and offers "a unique therapy [] called electric cell signal therapy" for neuropathy and chronic pain symptoms. Glickert asserts that "we accept all major insurance companies and Medicare…Insurance and Medicare does pay for therapies in our office."

189.   On November 16, 2020, Glickert appeared on another paid segment on KMOV St. Louis, which was published on Youtube. https://www.youtube.com/watch?v=ELEDVD-1hak. During this segment, Glickert notes that Vanguard offers "Sanexas treatments" for knee pain. Glickert assert that this treatment is covered by "Medicare and most major insurances."

---

[1] There are two patients who were never billed for Medicare services after their initial visit where they received TM Flow testing. The reason why they apparently did not return to Vanguard for treatment is unknown.

190.    Vanguard provided a "Chronic Pain Protocol" to patients, which assert that its vitamin injections could regenerate nerves. The only study cited in support of that assertion involved administration of vitamin B complex and vitamin B12 in an "experimental rat model" in the acute period of peripheral nerve injury. The document also claims that, "Our full protocol is covered by major medical insurances and Medicare."

191.    In an undated video advertisement, Vanguard claims that Sanexas can be used to treat knee pain and is covered by Medicare, along with other insurance companies. Vanguard claims that Sanexas can "regenerate nerves and reduce pain once and for all!"

**L.    All of Defendants' Medicare Billing was False Because Novof Failed to Satisfy the Requirements for Collaborating Physicians**

192.    Medicare law defines "collaboration" as a "a process in which a nurse practitioner works with a physician to deliver health care services within the scope of the practitioner's professional expertise, with medical direction and appropriate supervision as provided for in jointly developed guidelines or other mechanisms as defined by the law of the State in which the services are performed." 42 U.S.C. § 1395x(aa)(6).

193.    Vanguard billed Medicare under a collaboration agreement between its nurse practitioner and Novof, its Medical Director. Vanguard's nurse practitioner performed Sanexas treatment and ancillary services, and Novof was only periodically on-site.

194.    The Medicare regulations allow for Part B coverage of a nurse practitioner's services only if, among other things, the nurse "performs them while working in collaboration with a physician." 42 C.F.R. § 410.75(c).

195.    Missouri law allows a physician to enter into a collaborative practice

48

agreement with a registered professional nurse. Mo. Rev. Stat. § 334.104.

196.    Missouri law defines an "advanced practice registered nurse" as "a person who is licensed under the provisions of this chapter to engage in the practice of advanced practice nursing as a certified clinical nurse specialist, certified nurse midwife, certified nurse practitioner, or certified registered nurse anesthetist." Mo. Rev. Stat. § 335.016(2). Vanguard's nurse practitioner(s) are considered "advanced practice registered nurse(s)" under Missouri law.

197.    Missouri law requires that:

> It is the responsibility of the collaborating physician to determine and document the completion of <u>at least a one-month period of time</u> during which the advanced practice registered <u>nurse shall practice with the collaborating physician continuously present</u> before practicing in a setting where the collaborating physician is not continuously present.

Mo. Rev. Stat. § 334.104(10) (emphasis added).

198.    Novof did not complete a one-month period of time during which he was continuously present with Vanguard's nurse practitioner(s). Novof testified that he was physically present at Vanguard "at least once a month" and was working full-time in the ER at the time he had a collaboration agreement with Vanguard's nurse.

199.    Missouri law also requires that:

> If a collaborative practice arrangement is used in clinical situations where a collaborating advanced practice registered nurse provides health care services that include the diagnosis and initiation of treatment for acutely or chronically ill or injured persons, then the collaborating physician or any other physician designated in the collaborative practice arrangement shall be present for sufficient periods of time, <u>at least once every two weeks,</u> except in extraordinary circumstances that shall be documented, to participate in a chart review and to provide necessary medical direction, medical services, consultations, and supervision of the health care staff.

Mo. Rev. Stat. § 334.104(11) (emphasis added).

200.    Novof, however, testified that he did not keep any records reflecting his

visits to Vanguard and that he was only there "at least once a month."

201.    Because Vanguard failed to satisfy Missouri state law requirements for a collaboration agreement, including the one-month period of continuous supervision over a nurse and presence by Novof at least once every two weeks, its Medicare and TRICARE claims were not reimbursable.

**M.    Defendants Had Actual Knowledge, or at least Deliberate Indifference, of their False Billing**

*i.    Overview*

202.    By enrolling in Medicare, Vanguard, Glickert, and Novof were charged with knowledge of the Medicare laws, regulations, and coverage determinations. At minimum, Defendants were deliberately indifferent to the publicly-available NCD and LCDs, which conclusively establish that there is no Medicare coverage for Sanexas treatment and vitamin injections in the manner that Defendants administered them.

203.    Providers that validly bill Medicare use the same CPT or HCPCS code in every instance that they perform the same treatment. Despite the fact the Sanexas treatment that all Vanguard patients was essentially the same, Defendants billed Medicare for Sanexas treatment using *six* different medical billing codes, taking a whack-a-mole approach to seeing which codes were reimbursed at the highest levels or less likely to trigger an audit. For example, in November 2020, shortly before filing the Vanguard Complaint (*see* Ex. 3), Defendants used three different codes for Sanexas treatment (97016, 97032, 97150).

204.    According to his declaration, Glickert relied on the advice of RST and NBI that Sanexas treatment was covered by Medicare. *See* Glickert Decl. ¶¶ 2-8 (Ex. 2). Both RST and NBI, however, had a vested financial interest in asserting that Sanexas treatment

was covered by Medicare. RST stood to gain from device sales, and NBI stood to gain by keeping 8% of all Medicare payments received by Vanguard.

205.    In addition to the foregoing paragraphs, the following establishes that Defendants had actual knowledge, or at least deliberate indifference, of their false billing:

ii.    _Late 2018: Initial Purchase of the Sanexas Device and Medicare_ _Enrollment_

206.    Glickert's Declaration notes that, at the time when Defendants were considering purchasing the Sanexas device, he received a document titled "Insurance and Medicare Reimbursement" that "includes an example showing up to $583,200 revenue from Sanexas treatments per year, based on actual insurance claims submitted by NBI on behalf of health care providers." Glickert Decl. at ¶ 5 (Ex. 2).

207.    Glickert's Declaration also cites a "document entitled 'Get paid $$$ by insurance & Medicare for RST Sanexas Treatments!' which represented that NBI had a 'turn-key solution to … generate reimbursement of up to $7500.00 from private insurance and $4200.00 from Medicare for a 12-week 24 treatment program.'" Glickert Decl. ¶ 7 (Ex. 2).

208.    The Providers enrolled in Medicare and hired an NP in order to offer Sanexas treatment to Medicare beneficiaries under Part B of the Program.

209.    In order to facilitate billing, Novof served as Vanguard's "Medical Director." In practice, Novof did not actually see patients, but allowed Vanguard to use his name and title for billing purposes.

210.    According to Glickert, "With Medicare you can't bill the MD unless he's on site. You have to bill the NP (rendering physician). Federal beneficiaries, Medicaid and Medicare require that." (August 7, 2019 text message). Nevertheless, 904 Medicare Part

B claims were billed by Vanguard under Novof's NPI as the referring provider.

211.    On September 13, 2018, The Providers purchased their first Sanexas device from RST for $42,995.

212.    The following day, September 14, 2018, Glickert, on behalf of Vanguard, signed a "Medical Billing Services Agreement" with NBI. The agreement required NBI to perform medical billing services in exchange for a payment of "8% of all medical insurance and payment receivables collected/posted." Therefore, NBI's compensation was directly related to the Medicare reimbursement of Sanexas, vitamin injections, and ancillary testing.

213.    On October 1, 2018, Glickert emails M.J. and writes: "We bought a new machine. Looks to be a game-changer, too! Medicare reimburses around $160-180 for each patient. Private insurance is much higher. Its called a Sanexas and the creator is the co-developer of the HakoMed." (emphasis added).

214.    On October 24, 2018, Glickert sends a text message to Novof stating, "The money is in the mini nerve blocks. We can get $80-100 for just the therapy alone, but the reimbursement soars when we do the vitamin/buprivicaine injections." (emphasis added).

215.    On November 29, 2018, Glickert sends a text message to Novof stating, "Medicare allowable for Sanexas is $178. They pay $141 /treatment." Novof responds that Sanexas treatment was "[s]till worthwhile at $141." Novof testified that his text message meant that, at $141 per treatment, Medicare reimbursement would be enough to break even or even be profitable for the practice.

216.    From the outset, Defendants planned to use Medicare reimbursements for Sanexas treatment to make a profit on their significant capital investments in the Sanexas

devices. Defendants were also aware of the immense profitability of billing Medicare for vitamin injections in conjunction with Sanexas treatment.

    *iii.*    <u>*October 2018: Glickert and NBI Collaborate to Develop the Coding for Sanexas Treatment*</u>

217.     On October 4, 2018, Glickert emails NBI and notes that, "<u>My staff, including my nurse practitioner, is very concerned about medicare fraud and how billing is working</u>. I keep telling them that its going to be okay and that everything is going to be okay." (emphasis added). In response, NBI claims that Medicare is being billed correctly because "[w]e are using basic codes to treat the pain they have, chronic pain with proven therapies."

218.     On October 8, 2018, Glickert emails NBI a list of codes that they would use for electronic stimulation using the HakoMed device. Glickert states, "We have used a machine called a HakoMed (which is the Sanexas' predecessor). So it's typically billed very similar – two or three units of e-stim and NMR. So we should bill last week the same for the Sanexas treatments AND the HakoMed since we didn't do any injections last week." The codes that Vanguard lists on the attached "Charges Waiting to be Billed" sheet include the following HCPCS and CPT Codes: 97032, 97112, G0283.

219.     On October 9, 2018, NBI asks Glickert for the "price per unit so I can do that correctly." Glickert responds, "Therapeutic exercise 97110 is $45 per unit. HakoMed is 97032 and is $75 per unit. HakoMed is also 97112 and is $45 per unit. G0283 (regular estim) is $30."

220.     On October 12, 2018, Glickert emails NBI a "Charges Waiting to be Billed" report for the beginning of that month. The report identifies the codes used for Sanexas treatment and vitamin injections and contains handwritten instructions to NBI on how

to modify the claim submissions.

221.    On October 18, 2018, NBI emails Glickert a list of all the codes that would be used for the "macros" (*i.e.*, shorthand that triggers one or more codes) in the billing software (Kareo), which is copied below:



222.    Defendants were not only aware of the billing codes used for Sanexas treatment and vitamins injections, but were also involved in selecting the billing codes and familiar with their potential for reimbursement from Medicare. Defendants also moved forward with billing Medicare despite their concerns about Medicare fraud.

>    iv.    *December 2018: Glickert Begins Promoting the Sanexas Device to Hundreds of Medical Providers on a Private Message Board*

223.    On December 17, 2018, Glickert sends text messages to M.J. about creating a post on TX Fibro regarding Sanexas. Glickert notes that "the Medicare allowable for one treatment is $178." Glickert notes, "I've gotten about $16k in insurance checks this month and have another $30k due to be paid!"

224.    On December 19, 2018, Glickert sent text messages to M.J., "Woke up to two insurance deposits for $8800 for sanexas treatments. You can bill out of network

benefits and still get paid and still charge cash for services!!"

225.   On December 19, 2018, Glickert sent text messages to M.J., "I know how busy you are. But seriously, you gotta look into the sanexas. It's literally changing my entire practice." In response to M.J.'s question about whether Sanexas is used for peripheral neuropathy, Glickert responds: "Yes. It's [FDA] approved for any acute and chronic pain syndromes. PN [peripheral neuropathy] responds REALLY well on it - even chemo induced neuropathy…It's covered by insurance and Medicare. You could bill under your NP and collect benefits from Medicare/insurance…" (emphasis added).

226.   On January 9, 2019, Glickert created a post on TX Fibro titled "RST SANEXAS – LIFE CHANGER!!!," which was the first post discussing Sanexas and is described below:

   a. The post begins with a photo of Vanguard's case manager kissing a check for over $10,000 from an insurance company. For privacy reasons, her face has been largely cropped out:



   b. Glickert writes that the Sanexas device is "is INSANELY AWESOME for peripheral neuropathy - including chemo-induced neuropathy!! It's also is FDA Approved for ANY CHRONIC or ACUTE injury!"

    c.   Glickert describes performing ENFD testing, which is "a skin punch biopsy that we do for neuropathy patients." Glickert claims that the test "validates care to insurance companies" and that the test "is billable for an office visit and the lab bills insurance."

    d.   Glickert describes the vitamin blend: "The blend is basically B vitamins with glutathione, magnesium, calcium, etc. This blend is mixed with a tiny amount of lidocaine to create a numbing effect. The way I describe it to patients is that the lidocaine puts the nerves and muscles to sleep, then the Sanexas pumps the vitamins and minerals deep into the tissues, then when the nerves/muscles wake up, they 'yawn' and suck in all those vitamins and minerals."

    e.   Glickert promotes using NBI/M.E. for billing and asserts that he "knows how to bill it, he follows up with every EOB and makes sure that you're getting paid."

    f.   Glickert describes the billing methodology used by NBI/M.E. and how it reimburses: "The billing is a combination of several different codes. [M.E.] uses electric stim, NMR, vasopneumatic devicecodes, and general injection codes. Medicare allowable in my area is $178 - they do NOT pay for vitamin injections." (emphasis added).

    g.   Glickert includes a disclaimer that he would receive a "$1,000 referral fee per machine from RST Sanexas for M.J. group purchases" and may also become a "Sponsored Doctor."

227.   Glickert's "RST SANEXAS – LIFE CHANGER!!!" topic sparked numerous posted questions and comments from providers interested in Sanexas, several of which

are described below:

a.  In response to a question from a provider, on January 9, 2019, Glickert writes: "We have an MD, but he's not on site. He just reviews files. We have an NP do all the procedures and we're about to hire an LPN to do the injections for patients while the NP does the exams/re-exams."

b.  In response to a question about "post payment audits and payment take backs," on January 11, 2019, Glickert promotes using NBI for billing and asserts that, "The codes that are used are not crazy codes. There's nothing experimental about the machine or the treatments. We're just putting it all together in a nice protocol that gets results with patients and gets paid by 3rd party payers."

c.  In response to a provider's warning about Medicare audits, on January 21, 2019, Glickert writes:  "As far as the codes that we're using, a portion of the total procedure is e-stim, NMR, vasopneumatic device. The rest are injection codes. We inject a blend of vitamins into the area of complaint. The blend is mostly b-vitamins, vitamin-c, glutathione, minerals, and a few other things. Medicare does pay for the procedure of an injection. We bill for 4 injection sites to Medicare. Medicare is VERY firm on NOT paying for the vitamins." (emphasis added).

d.  Later on January 21, 2019, Glickert acknowledges that there are providers who have gotten into "trouble" by "doing nerve blocks and billing Medicare for it." Nevertheless, Glickert claims that "we are not doing nerve blocks."

e.  In response to concerns by other providers regarding Medicare billing, on January 22, 2019, Glickert wrote: "It sounds like several people are

concerned about Medicare. Personally, I'm not. Maybe I'm naive. Maybe I just like risk? Who knows."

     f.    In response to more concerns regarding Medicare billing, on January 31, 2019, Glickert wrote: "So for me, I'm willing to take the risk of billing NMR to Medicare (and everything else that we do), because I'm confident that it is defensible. The Sanexas is FDA approved as a device for e-stim, interferential, and NMR. What is Medicare going to say in an audit? The FDA is the highest regulating body for medical devices in our country. Are they going to say that the FDA is wrong? Are they going to say that the FDA made a mistake and Medicare is right?"

228.    Glickert's "RST SANEXAS – LIFE CHANGER!!!" posts were factually wrong and misleading, because the Sanexas device is not FDA approved, nor is it cleared to treat "any chronic or acute injury." Instead, the Sanexas device is 510k cleared as substantially similar to a predicate device and is only cleared to treat certain specified medical conditions.

229.    By admitting that "lidocaine puts the nerves and muscles to sleep," Glickert concedes that the vitamin blend constitutes a nerve block, which is excluded from coverage by the applicable NCD and LCDs.

230.    Although Glickert repeatedly stated that Medicare does not pay for vitamin injections, Defendants billed Medicare Part B thousands of times for vitamin injections used in conjunction with Sanexas treatment.

231.    Because he received a significant referral fee from RST, Glickert was financially incentivized to promote the Sanexas device to other providers. This post became the springboard to launch Defendants' scheme to distribute Sanexas devices on a

nationwide scale.

232.    Glickert repeatedly promoted billing the Sanexas device to Medicare, despite warnings from other providers.

233.    Glickert expressed his knowledge regarding the codes that NBI was using to bill for Sanexas treatment and falsely claimed that the codes were appropriate.

> v.    *Feb.-Aug. 2019: Glickert Continues to Promote Sanexas Despite Knowing that it was Not Covered by Medicare*

234.    Despite claiming to offer services that were billable to insurance in order to reduce patients' out-of-pocket cost, in fact, the Providers were primarily interested in attracting patients whose insurance provided lucrative reimbursements. On February 12, 2019, Glickert emailed NBI: "Really need to know what Medicaid is reimbursing for the full Sanexas protocol. We need to know if it's worth taking those patients."

235.    On May 1, 2019, NBI forwards a note written by RST Sanexas concerning the revised vitamin blend, which notes, "It is not a requirement for successful patient treatment, but appears to support electric cell signaling patient treatment in numerous ways, such as anti-inflammatory effects, circulatory influence, tissue repair (including needle trauma and anatomical distortion), enhanced nerve growth, faster patient response, as well as significant increased billing reimbursement for the healthcare provider." (emphasis in original).

236.    Because Medicare only covers necessary medical services, RST's admission that vitamin injections are not required for patient treatment established that they were not covered by Medicare.

237.    On May 28, 2019, Glickert created a post on TX Fibro titled, "Million Dollar Practice!!!" The post describes how Glickert's revenue had risen from $8,000 per month

to $109,000 per month.

238.    In or around June 6, 2019, Glickert sent RST a letter of explanation of actual payments received from Medicare, along with an unredacted Explanation of Benefits (EOB) from March 12, 2019. Glickert's letter explains that he is billing out around $700 for Medicare. The allowable by Medicare, including Sanexas treatment and vitamin injections, was $203.88. The EOB from Medicare Part B includes electronic stimulation CPT codes 97032, 97112, 97016, and vitamin blend CPT codes 96372, J3475, J3411, J3420, and J3415.

239.    On July 12, 2019, Glickert sent a text message to RST with a photograph of an article titled "Chiropractor brothers to settle with Medicare." The article, which ran in the Kansas City Star on the same day, describes a chiropractic clinic that advertised it could heal peripheral neuropathy by "rejuvenating damaged nerves." https://www.kansascity.com/news/business/health-care/article232506142.html.    The article notes that the providers:

> Billed Medicare for nerve tests and falsely stated they were performed by doctors "when they were not actually interpreted by any qualified health care professional,' the U.S. Attorney's Office said Tuesday. They also billed for nerve block injections guided by ultrasound that were not medically necessary and billed for 'vasopneumatic device' treatments (with specialized equipment to compress swelling) that were actually just sessions in mechanical massage chairs, the office said.

Because Glickert was also billing Medicare for nerve block injections and using vasopneumatic codes for the Sanexas device, this press release provided ample warning that Defendants' billing could also be fraudulent.

240.    On August 19, 2019, another provider emails Glickert regarding issues with NBI. Glickert responds:

> He's hired several new billers since [K.D.] took over sales with Sanexas.

Between my referrals (I believe that over 50 machines have been sold because of names that I've brought to the table) and [K.D.'s] sales – [M.E.'s] business has exploded…. I'm really not worried about what [M.E.] is doing and how he's billing things. I've spent a lot of time researching the codes (especially when I was working on my blend) and I don't see anything that's concerning.

(emphasis added).

241.    On August 19, 2019, a provider emails Glickert and asks, "So, the [Sanexas] reimbursement is injection driven?" Glickert responds: "Injections are what helps the reimbursements."

242.    Despite their awareness that a similar nerve block scheme used in conjunction with a medical device was considered Medicare fraud, and despite knowing that vitamin injections were not medically necessary, Defendants continued to bill Medicare for Sanexas treatment and vitamin injections and promote their false billing scheme to other providers.

vi.    *May 2019: Defendants' Certificate of Medical Necessity was Designed to Mislead Insurance Carriers*

243.    On May 13, 2019, NBI asks Glickert for a Certificate of Medical Necessity (CMN) template to use going forward. Glickert responds a few minutes later that "Dr. Novof and [Nurse Practitioner] like the letter" and attaches the CMN.

244.    On September 18, 2019, NBI asks Glickert for a CMN for patient V.W. Glickert responds the same day with a CMN signed by Novof. The CMN is titled, "Statement of Medical Necessity: RST Sanexas neoGEN-Series combined with Subcutaneous Nutri-Pharmaceutical Injections" and is similar to the May 13, 2019 template.

245.    The CMN states that it was intended to "document the need for care at The Vanguard Clinic utilizing our full protocol of the RST Sanexas neoGen-Series

therapy device and subcutaneous injections of a Nutri-Pharmaceutical blend for treatment of chronic pain syndromes."

246.    The CMN asserts that the "Sanexas device is FDA cleared" for several clinical indications, including "acute" paid conditions. The Sanexas device, however, was not FDA-cleared for acute pain conditions.

247.    The CMN states, "The Nutri-pharmaceutical specialized blend injections are used to facilitate the regeneration and growth of the nerve cells and fibers, pursuant to several clinical studies." Novof, however, testified that he was unaware of the ingredients in the blend and therefore did not know whether the blend could regenerate or grow nerve cells and fibers. Along the same lines, Novof testified that he did not know whether clinical studies supported the purported benefits of the vitamin blend.

248.    The CMN fails to acknowledge that the vitamin blend contains the same ingredients that could be found in over-the-counter supplements, and indeed fails to identify *any* of the active ingredients in the blend.

249.    The CMN cites several irrelevant or minimally relevant studies for the proposition that Sanexas treatment and vitamin injections could be used in combination to regrow nerves. For example, the first study listed is a "Basic Investigation" study merely found higher levels of peripheral blood stem cells in rats that received low-frequency electronic stimulation. "Low-Frequency Electrical Stimulation Induces the Proliferation and Differentiation of Peripheral Blood Stem Cells Into Schwann Cells," Am. J. Med. Sci., Vol 349 at 157-61 (Feb. 2015).

250.    The CMN concludes, "Based on the above facts, I am confident that you will agree that our protocol of therapy with RST Sanexas neoGen-Series

combined with subcutaneous Nutri-pharmaceutical blend injections is clearly indicated and medically necessary for this patient." Novof, however, testified that he had "no opinion" on whether vitamin injections were medically necessary for patients receiving Sanexas treatment.

251.    Defendants' CMN confirms they were in possession of the FDA's 510(k) clearance letter for the Sanexas device and aware that the Sanexas device was FDA cleared (not FDA approved) only for specific indications. Defendants were also aware that the Sanexas device was not cleared to be used in combination with vitamin injections. Nevertheless, on October 15, 2019, Glickert emails a provider a "Diagram Guide" for Sanexas that contains the Vanguard logo on the first page. The guide includes instructions for using Sanexas to treat migraines, which it is not FDA cleared to treat.

252.    The CMN admits that the "[l]idocaine injections are also beneficial as a local anesthetic." Accordingly, Defendants' CMN admits that the vitamin injection acted as a local anesthetic, which is how a nerve block is defined under the applicable LCD (L35222).

253.    Novof testified that he signed CMNs used by Vanguard for patients receiving Sanexas treatment and ancillary services.

254.    Defendants' CMN was false because, despite signing the note, Defendant Novof lacked the knowledge to support its assertions of medical necessary.

255.    Defendants' CMN was designed to mislead insurance carriers, including Medicare, by using the term "pharmaceutical" to describe the vitamin blend, citing irrelevant studies, concealing the ingredients of the vitamin blend, and purporting to be authored by a medical doctor.

>   vii.    _September 13-14, 2019: Glickert Hosts a Sanexas Conference at Vanguard and Boasts of his Profits_

256.   On September 13-14, 2019, Glickert hosted a Sanexas conference at Vanguard called the "RST – Sanexas Advanced Users Meeting." Approximately 30-40 people attended. A segment of that conference was recorded on video as "The Dr. Glickert Story." The video runs for approximately 14 minutes and is described below:

a.   Glickert begins by thanking M.J. and remarks that when he met M.J. he was making about $6,000 per month, and "now I make about $6,000 a day."

b.   Glickert notes losing money in 2018 and taking on a significant amount of debt. Glickert describes meeting a sales representative for RST, known to Defendants as K.D., who advised him to buy the $40,000 Sanexas device in order to bill to insurance. Glickert told K.D., "If I'm going out, I'm going out big."

c.   Glickert reports losing $37,000 for the month of October 2018, which was after "nine straight months of losing money." Glickert notes that, at that time, he had accumulated approximately $140,000 in loans and $60,000 in credit card debt.

d.   Glickert states that, in mid-October 2018 he started "researching bankruptcy attorneys." But, in November 2018, Vanguard posted a profit of $4,000 due to the Sanexas patients billed to insurance during the prior month.

e.   In December 2018, Glickert saw "more checks come in." He got a "first-ever $11,000 check from an insurance company. I said this might be onto something. We're doing good. I like this."

f.   Glickert bought a second Sanexas device in December 2018 and a third device in January 2019.

64

g.  For 2019, Glickert expected to profit around $500,000.

h.  In March or April 2019, K.D. called Glickert about the TM Flow device that could be used to test patients. Glickert purchased the device for $32,500.

i.  Vanguard stopped offering other services (with the exception of stem cells) in order to focus on Sanexas.

j.  Glickert notes that many of his patients are covered by insurance and have no out-of-pocket expenses.

257.  Glickert boasted of Vanguard's profits in order to attract other medical providers to the Sanexas billing scheme as potential customers of FDL.

*viii.*  *Oct.-Nov. 2019: Glickert Bills and Promotes the Most Profitable Sanexas Codes Despite Knowing they were Wrong*

258.  On October 2, 2019, Glickert emails an employee of M.J.'s practice and writes: "Since the codes we bill are very general codes - everyone pays them. And since Medicare pays - every insurance carrier has to pay." Glickert also describes the patient flow at Vanguard:

> Patient calls to schedule free consult. Patient meets with Patient Advocate (some call this position the Case Manager - and this can be done by [M.J.] or really anyone). Patient Advocate listens to complaints, asks some simple disqualification questions and informs patient of any copays if they want to move forward with the exam. Patient says yes, so the Nurse Prac. does medical exam and toronto. If patient qualifies for ENFD and/or TM-FLOW then room is prepped for ENFD and our TM-Flow is on a cart with wheels. TM-Flow is performed by a rehab tech, office manager, myself, or anyone that is trained on it. Afterwards Nurse Prac. comes back in and does punch biopsy. Patient comes back 24-48 hours later and meets with the Patient Advocate. Tm-Flow data is reviewed with patient. Exam findings reviewed. Recommendations are given. Patient advocate tells patient what costs are (if any) and may make a pitch for cash services at this time. Patients will almost always say yes to insurance services - since they are covered. Sometimes they say 'yes' to insurance AND cash service recommendations. Patient is taken to the treatment room and start their first Sanexas treatment.

259.    On October 8, 2019, Glickert messages M.J. the codes used for Sanexas treatment: "97032 is estim. 97112 is NMR. 97016 is vasopneumatic device."

260.    On October 10, 2019, Glickert created a topic on TX Fibro titled "Sanexas Billing: 97032 vs 97014." Glickert copies a response from M.E., who explained that the 97032 code required "somebody 'attending' the person getting the stim, if they just leave the patient and wait until it beeps and they come into the room then that is not attended, so most chiropractic offices are 'unattended' because they hook up the stim, walk out, and wait until it beeps then go in and disconnect the unit." (emphasis added). Glickert recommends that if providers are "scared" of billing 97032 or 97014, then "you can bill the lower code of 97014 (which should be G0821 for Medicare) - this will hurt your reimbursement."

261.    In response to a question under the topic "Sanexas Billing: 97032 vs 97014," Glickert posts on TX Fibro on January 14, 2020, "NMR [Neuromuscular reeducation] pays the best of all the codes that we bill for Sanexas. While the reimbursement for a Medicare visit will drop a bit (probably $20-30 per visit) by billing 97014 vs 97032, I'm looking into when it makes sense to hire a PT and PTAs to be able to bill the 97032."

262.    On October 28, 2019, M.J. creates a topic on TX Fibro titled "Sanexas: One-On-One Consulting," which describes how M.J. and Glickert "are starting a consulting company together." M.J. describes how, "once you get this rolling, you are going to collect $2-$4M/year and it will be all staff driven!" On the same date, M.J. and Glickert discuss by email different packages that could be offered to clinics, which would cost up to $120,000.

263.    On November 16, 2019, a provider forwarded Glickert a warning concerning

Medicare billing for the Sanexas device from a billing professional for Advanced Medical Integration. The billing professional explained that, in light of Medicare's definition of a vasopneumatic device, "I cannot see how the billing of this [97016] code is applicable.... Just because the company defines the device as a vaso pneumatic device does not mean medicare does as well."

      a.   Glickert responds that, "[i]t appears that from the description of the vaso code that what we're using it for fits the Medicare requirements."

      b.   The billing professional then replies, "<u>I just don't want to have a bunch of doctors get targeted by [M]edicare for billing codes that are solely PT codes, or codes that are for a service that is not explicitly listed as what that service is for</u>." (emphasis added)

264.   On November 14, 2019, Glickert and M.J. discuss expensive wines from Napa Valley. M.J. remarks, "Haven't had Screaming Eagle yet." Glickert responds: "Let's get a few clinics making $2-$M [million] each and go get some!"

265.   Despite knowing that it was wrong to bill attended and vasopneumatic codes for Sanexas treatment, Defendants continued to do so in order to maximize Medicare reimbursements. Defendants also ordered unnecessary ENFD and TM Flowing testing for patients that would inevitably begin Sanexas treatment regardless of the results of that testing.

      *ix.*   *<u>Late 2019: Glickert and M.J. Hire a Healthcare Attorney to Evaluate the Coding and Coverage for Sanexas Treatment and Vitamin Injections</u>*

266.   Over one year after beginning to bill Sanexas, M.J., Glickert, and other providers engaged the Chapman Law Group ("Chapman") to issue advisory opinion letters regarding Sanexas.

267.    On December 10, 2019, Chapman issued its "Opinion Regarding Billing Codes for Sanexas" (the "Chapman Letter"), which M.J. provided to Defendants and which widely shared among members of the TX Fibro board. Notably, this letter highlighted significant concerns regarding billing Sanexas treatment:

    a. This letter found that the 97032 code requires "***CONSTANT ATTENDANCE***" and "one on one, face to face care with the patient." (emphasis in original).

    b. The letter concluded that that the 97016 code requires "application of a vasopneumatic device" and that coverage only exists "as it relates to swelling and/or lymphedema."

    c. The letter noted that the 97112 code requires "direct one on one care" and states "[t]his is exercise, movement-based coding related to proprioception and coordination, not related necessary to Sanexas."

268.    The Chapman Letter also identified concerns with billing vitamin injections. With respect to "J Codes," the letter notes that "[t]hese are the injected fluids, related to Code 96372." The only Medicare coverage identified is for B12 injections if one of three highly specific conditions are present.

269.    The Chapman Letter identified concerns with billing Sanexas treatment and vitamin injections in a chiropractor's office. The letter notes that Medicare covers a chiropractor's services "<u>ONLY</u> when rendering services related to manual manipulation of the spine to correct a subluxation." (emphasis in original). The letter does not opine that Sanexas treatment or vitamin injections are covered by Medicare, but instead merely concludes that a chiropractic practice needs a collaborating physician and NP in order to bill to Medicare.

270. On January 3, 2020, M.J. emails Glickert and NBI and writes: "I am going to send the attorney letter . . . <u>There looks to be an issue with the vasopneumatic billing</u>." (emphasis added).

271. On January 8, 2020, M.J. forwards Glickert a text message from a fellow chiropractor, which states:

> <u>[T]he attorney letter isn't encouraging at all.</u> I'm sure you're aware that it says we can't use one code ( 97016) if we use the EMS Code(97032). Then it says the NMR code (97112) is exercise based "not related necessarily to Sanexas." I realize that she does not explicitly state that we can't use the code for Sanexas, but she made it ambiguous enough to be interpreted either way, covering her backside but not ours. <u>If anything the language leaves us exposed if we use NMR for Sanexas.</u>
>
> The J codes opinion either shows a lack of understanding of the billing practices of the proprietary blend or a discouragement in using them except in specific rare cases. Again, not helpful to our cause. <u>The letter leaves us in a position that if we bill as NBI recommends and have issues, may have even greater culpability than if the letter was never written as it may be said that we were forewarned and ignored legal advice.</u>
>
> We hired an attorney to form an opinion in a similar situation 5-10 years ago and were left with the same feeling that I have with this attorney. It was discouraging because it seemed to lack a thorough understanding of the codes, as if it was easier to take the most conservative opinion, rather than a thought out one. In both cases <u>it seems they were intentional in taking their unhelpful opinion.</u> To be respectful of you and how you want to disseminate the letter, I will wait until it has gone public but I assume I won't be alone in my disappointment in her opinions.

(emphasis added).

272. On the same day, January 8, 2020, Glickert responds to the provider's concerns: "I get it. I do agree with him."

273. Despite the concerns identified in Chapman's December 10, 2019 letter, and acknowledgement of those concerns by Glickert and other providers, Defendants continued to bill improper codes for Sanexas treatment and vitamin injections. Notably, Defendants continued to bill the 97032 attended code until at least November 12, 2020.

x. *Late 2019-Early 2020: Despite Warnings from Other Providers, Glickert Continues to Promote the Billing Scheme that He and NBI Developed*

274.    In November-December 2019, RST published an "Advanced Protocols" document, which was widely shared among purchasers of the Sanexas device and discussed on the TX Fibro board. That document explained that: "The injections are not 100% necessary in order to get relief; the treatments initiate the healing process while relieving symptoms." (emphasis added). In response to a question regarding whether the injections were a mandatory part of the protocol, the Advanced Protocols document stated, "The blend is an option available to you but is not required for treatment." (emphasis added).

275.    On December 13, 2019, M.J. asks whether there are "any LCD or NCD guidelines with Sanexas?" Glickert responds that he has "spent many hours looking for anything specific. I've not been able to locate anything other than the lcd regarding billing ankle nerve blocks for neuropathy." M.J. remarks that "[m]any were burned by nerve blocks." Glickert responds:  "They were burned because they didn't read them. The LCDs were very clear that you cannot bill that way - but doctors/clinics chose to do it anyway. Medicare was very black and white about them - still people felt like they could get away with it." Accordingly, Glickert was aware that billing for nerve blocks despite a prohibition under the LCD could be considered fraudulent.

276.    On December 17, 2019, Glickert emails NBI documents entitled, "How to blend" and "How to bill." The "How to bill" document instructs NBI/M.E. to use certain "Macros," which contain the codes used for common treatments. For example, the "MCSTIM" macro is described as the "full sanexas treatment" billed to Medicare. The "How to blend" document is the same as the one described in Paragraph 99, *supra*, which

is dated September 19, 2019.

277. On December 27, 2019, Glickert responded to a post on TX Fibro titled, "Why You Need to Use [M.E.] and NBI." Glickert writes: "I trusted the process and I trusted [M.E.]/NBI. 8% seems like a LOT, but they have consistently gotten me paid - each and every month! They LOVE collecting money and getting insurance companies to pay. He works extremely hard to get every single penny we deserve for what we're doing. Trust the process. Trust the system. The money will come and I NEVER have a problem paying [M.E.'s] bill each month. This month, we'll top $200k in collections!"

278. On January 14, 2020, Glickert sends a text message to M.J., that per his conversation with M.E., NBI will "change Medicare billing to the 97014 code (unattended)."

279. On February 17, 2020, Glickert receives an email from a clinic expressing its concerns regarding Sanexas billing:

> 97032 is classified as a MODALITY REQUIRING CONSTANT ATTENDANCE. This means that direct (one-on-one) patient contact is required. If you are simply hooking the patient up and taking them off the machine at the end of the session, and are not in constant attendance, this would not be an appropriate code to bill. This is a timed code, billed in 15 minute increments.
>
> 97016 is classified as a SUPERVISED MODALITY. This means that it does not require direct (one-on-one) patient contact. While the Sanexas unit has a vasopneumatic component to it, the FDA did not clear it as a Vasopneumatic device. Therefore, if 97016 is billed for Sanexas, a payer who discovers the method of therapy may consider this procedure to be experimental and investigational. Patients should be notified in advance accordingly.

(emphasis added).

280. On February 21, 2020, a member created a topic on TX Fibro titled, "Vit[amin] Inj[ection] — My overseeing MD uneasy about billing it." The member

71

explained that "My MD who is overseeing my NP's is uneasy about billing medicare etc for Vitamin injections each visit. She had some issues in the past at another office with medicare issues. Not with Vitamin injections or Sanexas but with something else so she is a bit jaded." Glickert responded he doesn't bill ankle nerve blocks, because: "Back in 2013 Medicare came after a number of clinics that were billing ankle nerve blocks. Clinics were fined, had to pay back big time payments, and some people even went to jail. Medicare was extremely black and white on billing nerve blocks, but clinics did it anyway. Medicare has an NCD about this, yet, some clinics decided not to pay attention. So lots of them got pinched." (emphasis added).

281.    On February 28, 2020, in response to a question on TX Fibro, Glickert instructs a provider how to draft a template note for physical therapy in conjunction with Sanexas. Glickert also explains:  "You can bill your own PT as long as you're in-network with major medical. Medicare does NOT pay for anything from a chiro except for spinal manipulation to treat subluxation."

282.    On March 9, 2020, Glickert receives an email from a provider warning about a "Neuropathy scam" whereby "Sanexus [sic] is trying to get DCs to hire NPs so they can bill [M]edicare for their machine and that it ends in '[M]edicare fraud'." (emphasis added).

283.    In sum, despite knowing that billing Medicare in a manner contrary to its coverage determinations could result in civil or criminal enforcement, and despite numerous warnings from providers about billing Sanexas to Medicare and the codes Defendants used, Glickert continued to collaborate with NBI on a billing scheme and promoted his collections to other providers who were considering purchasing Sanexas devices.

      *xi.*    *June-Nov. 2020 – The Providers Continue to Bill Medicare Despite Their Own Serious Concerns*

284.    On June 7, 2020, Glickert emailed Vanguard employees that "<u>Effective immediately we can no longer treat neuropathy type symptoms of patients that have Medicare, Medicaid, or another federal based program</u>. They will need to be self-pay at $125/treatment. All current neuropathy pain symptom patients will need to be told that Medicare will no longer be paying for their treatments and they will need to pay $125/treatment if they wish to continue." (emphasis added). Nevertheless, the Providers continued to bill Medicare for Sanexas treatment and vitamin injections until May 2021.

285.    On June 9, 2020, Novof sends a text message to Glickert stating, "Fleur de Lis Health is preparing a letter for warning end users of billing Sanexas treatments to Medicare. Vanguard Clinic is preparing to return collections from Medicare so we don't want you to be in the same position. Vanguard Clinic will no longer be accepting Medicare patients for Sanexas." Glickert responds: "Wait, we will accept them. We're looking into other avenues to bill to Medicare and we're having them be self-pay until we feel comfortable."

286.    On June 16, 2020, Glickert sends a text message to Novof planning to terminate NBI and stating: "We'll repay Medicare ASAP and try to figure out if we're incorrectly billing major medical."

287.    Despite planning to cease billing Medicare, however, the Providers continued to bill Medicare for Sanexas treatment and ancillary services through May 2021. Additionally, Defendants have never paid back Medicare.

288.    On August 3, 2020, Glickert emails NBI that "[m]y attorney has an issue with the 1 on 1 code of NMR and Electric Stimulation." Glickert also asks: "As an

authorized distributor of Sanexas equipment how do I handle the objections of Medicare and potential claw-backs? We have the attorney letter from [Chapman], but recently a clinic told me that Medicare has a [NCD] that NO electrical stimulation devices can be used on the feet."

289.   On October 8, 2020, Glickert emails NBI instructions about how to bill CPT Code 99213 for injections. Citing a LCD, Glickert writes, "Do NOT bill out 99213 at every injection. CMS clearly states that unless there is a separate and identifiable new diagnosis."

### N.   The Providers Admit that their Medicare Billing was Fraudulent in a December 2020 Lawsuit they Filed

290.   On December 10, 2020, Plaintiffs Vanguard and Glickert filed suit against NBI, RST, and others, alleging breach of fiduciary duty, fraud, and other claims arising under the common law and California law. *The Vanguard Clinic, LLC v. Nat'l Billing Institute, LLC*, 20-CV-11234 (C.D. Cal.), ECF No. 1 (the "Vanguard Complaint") (Ex. 3).

291.   The Vanguard Complaint alleges that Defendants purchased multiple Sanexas units at a cost of approximately $50,000 and a TM Flow unit for $35,000. The Vanguard Complaint further alleges that, "Plaintiffs' decision to make such a substantial investment in Sanexas was entirely based on RST and NBI's representations regarding the medical necessity of Sanexas in treating chronic pain, and its coverage by Medicare and other insurance companies." *Id.* ¶ 48 (emphasis added).

292.   The Vanguard Complaint alleges that Defendants were trained that, during administration of the Sanexas device, the "the healthcare professional may leave the room and only check in every few minutes" over a 15 to 30 minute period. *Id.* ¶ 49.

293.   The Vanguard Complaint acknowledges that "[s]ubmission of medical

claims containing improper CPT or HCPCS codes expose healthcare providers to significant criminal and civil liabilities under both Federal and State law." (citing 18 U.S.C. § 1347; 31 U.S.C. § 3729). *Id.* ¶ 60.

294.    The Vanguard Complaint admits that the billing codes that Defendants used were improper and were not covered under the applicable NCD and LCDs: "[I]t is Plaintiffs' understanding that NBI and Kareo have been billing Sanexas to Medicare and other insurance companies using the following CPT codes: 97016, 97032, and 97112. However, none of these codes are proper for electrical stimulation using the Sanexas device, because Medicare rules and regulations— including applicable NCDs and LCDs— only cover these codes for certain circumstances not applicable to Plaintiffs' use of Sanexas." *Id.* ¶ 61.

295.    The Vanguard Complaint admits that billing CPT code 97016 for Sanexas treatment was improper:

> To illustrate, CPT code 97016 is used for application of vasopneumatic devices to one or more areas, not requiring direct (one-on-one) patient contact. Medicare only covers the use of vasopneumatic devices for the purpose of reducing edema or lymphedema. Furthermore, the treatment must be supported by documentation identifying the location of the edema on the body, measurements of the edema, and effects of the edema on the patient's function. Even when these requirements are met, treatment of lymphedema by a vasopneumatic device is considered necessary only for a short period of time, unless there is documentation supporting the patient's need for continued treatment by a physician as opposed to at home treatment by the patient using a lymphedema pump. Accordingly, NBI and Kareo's use of CPT code 97016 in submitting claims on behalf of Plaintiffs was improper, because Plaintiffs were using Sanexas to treat  chronic pain, not edema or lymphedema, and the patient records provided by Plaintiffs to NBI and Kareo did not describe an edema on the patient's body.

*Id.* ¶ 62.

296.    The Vanguard Complaint admits that billing CPT code 97112 for Sanexas treatment was improper:

CPT code 97112 is used for neuromuscular reeducation therapies, requiring direct (one-on-one) patient contact. These include physical exercises and activities designed for restoring balance, coordination, kinesthetic sense, posture, and proprioception. For example, Medicare considers a gym ball exercise used for the purpose of improving balance as neuromuscular reeducation which may be billed using code 97112. ... Plaintiffs' use of the Sanexas device did not involve physical exercise, and was provided to treat chronic pain rather than restoring balance or coordination. Accordingly, NBI and Kareo's use of CPT code 97112 to bill Sanexas on behalf of Plaintiffs was improper.

*Id.* ¶ 63.

297.    The Vanguard Complaint admits that billing CPT code 97032 for Sanexas

treatment was improper:

CPT code 97032 is used for application of electrical stimulation to one or more areas, requiring constant, one-on-one, manual patient contact by the physician or other qualified healthcare professional. Medicare pays for code 97032 only where it is supported by documentation clearly identifying the type of electrical stimulation used, justifying constant one-on-one patient contact. For example, direct motor point stimulation delivered via a probe may properly be billed using CPT code 97032, because it requires constant involvement of the healthcare professional during treatment. In contrast, where the treatment requires application of the electrical stimulation modality by a physician or other qualified healthcare professional, without the need for constant, direct patient contact throughout the treatment, the billing code for unattended/supervised electrical stimulation must be used. NBI and Kareo's use of CPT code 97032 to bill Sanexas on behalf of Plaintiffs was improper because Plaintiffs' use of the Sanexas device... did not involve or require constant, direct patient contact throughout the treatment. Notwithstanding, use of CPT code 97032 was also inappropriate because NBI and Kareo were billing this code for the same period of time they were billing CPT code 97112. Given that CPT codes 97032 and 97112 require constant, direct patient contact, billing both for the same period of time is improper.

*Id.* ¶ 64.

298.    The Vanguard Complaint admits that Defendants' billing of vitamin

injections to Medicare was improper:

Similarly, it is Plaintiffs' understanding that NBI and Kareo have been billing the Multi-Vitamin Blend injections to Medicare and other insurance companies using multiple HCPCS "J" codes for each ingredient in the blend.

However, Medicare and other insurance companies require drug mixtures and compounds to be billed using HCPCS codes J3490 (unclassified drugs), J3590 (unclassified biologics), J7999 (compounded drug, not oral) or, J9999 (not otherwise classified, antineoplastic drug); rather than billing each ingredient separately. Furthermore, <u>Medicare generally does not consider vitamin injections to be medically reasonable and necessary for diagnosis or treatment of an injury or illness</u>. While there are some limited exceptions to this general rule, none are applicable to treating chronic pain. <u>Accordingly, NBI and Kareo's billings for the Multi-Vitamin Blend injections was improper</u>. To make matters worse, Plaintiffs have learned that NBI and Kareo were billing for ingredients not contained in the blend, billing for ingredients Plaintiffs had expressly told them not to bill, and on at least one occasion, billing for an injection when the patient had not received one.

*Id.* ¶ 65 (emphasis added).

299.    The Vanguard Complaint admits that Glickert was aware of the billing codes used by NBI as of at least early 2020. *Id.* ¶ 57.

300.    Glickert's declaration admits that "NBI's wrongful conduct has exposed Vanguard Clinic and I to significant harm, which to my understanding may include both criminal and civil liability." Ex. 2 ¶ 17.

301.    Glickert's declaration also asserts that: "[N]either I nor any other person at Vanguard Clinic ever told NBI or Kareo what CPT code to use for billing Sanexas. Rather, it was NBI that selected the CPT codes, number of units, modifiers, diagnostic codes, and other billing related information on behalf of Vanguard Clinic." Ex. 2 ¶ 9.

302.    Glickert's testimony that NBI was solely responsible for Sanexas-related billing was false. In fact, Defendants instructed NBI how to bill Sanexas treatment and vitamin injections to Medicare and were aware of the codes being used per the Explanation of Benefits ("EOBs") forms they received.

303.    In any event, hiring a billing company does not absolve Defendants of their responsibility for complying with the Medicare laws and regulations and for ensuring that

billing done under their names and/or medical licenses is done correctly.

304.   If Defendants hypothetically became aware that Medicare billing done under their names and/or licenses was being done by NBI in a manner contrary to their instructions, they should have stopped billing immediately and should not have retained any overpayments. Instead, Vanguard used NBI as its billing company for Sanexas treatment and vitamin injections *for over two years*, from September 17, 2018 through late 2020. As reflected in the chart below, nearly all of Defendants' Medicare payments related to Sanexas treatment and ancillary services came during their engagement of NBI. *See infra* ¶ 295.

> xii.   <u>*The Providers Continued to Bill Sanexas Treatment and Ancillary Services After Filing the Vanguard Complaint, Despite Warning Others of the Dangers of Doing So*</u>

305.   Because the Vanguard Complaint, filed December 10, 2020, admits that Medicare did not cover Sanexas treatment and vitamin injections in the way that Defendants administered them, any Medicare billing after that date constitutes knowing fraud. Nevertheless, the Providers continued to bill Medicare for Sanexas-related codes for another six months (until May 13, 2021). The chart below reflects the amount that Medicare Part B paid Vanguard on a quarterly basis from 2018-2021:



306.    In total, Defendants submitted nearly 800 claims to Medicare Part B for Sanexas treatment and ancillary services on after filing the Vanguard Complaint, for which they were paid approximately $16,500.

307.    After filing the Vanguard Complaint, Defendants began using a different code (G0283) for Sanexas treatment. The G0283 code is for "[e]lectrical stimulation (unattended), to one or more areas for indication(s) other than wound care, as part of a therapy plan of care." In light of the applicable NCD and LCDs referenced in the Vanguard Complaint, however, Defendants were aware that there was simply no Medicare coverage for Sanexas treatment in the manner in which they were administering it. Indeed, Glickert sent several emails in 2021, discussed below, which concluded that the new coding for

Sanexas treatment was illegal.

308.    On May 19, 2021, Glickert emails a consultant (known to Defendants as Dr.

D.D.) regarding an "NCD/LCD Question." Glickert warns that the "new" billing codes

could be improper or lead to enforcement action:

> 1) I believe there is an NCD (possibly an LCD) that says that using B12
> injections is only medically necessary to treat Pernicious Anemia. I believe
> Medicare also expects there to be lab findings showing a deficiency in B12
> for it to be a billable service. . . . .
>
> 2) I also believe there is an NCD suggesting that treating Peripheral
> Neuropathy is not considered medically necessary and pharmaceutical
> management is the only authorized treatment option for treating PN. While
> clinics are coding G89.4 (or some version of G89.X - chronic pain
> syndrome), it might seem that clinics are using this diagnosis to 'skirt
> around' the NDC regarding treatment of PN. While clinics may claim they
> are treating the pain associated with neuropathy as evident by their ICD-10
> code, the clinic's advertisements and marketing efforts suggest something
> completely different. <u>Seems this might be a 'ticking time bomb' for clinics
> as people have gone to jail for violating this NCD.</u>

(emphasis added).

309.    Likewise, on June 2, 2021, Glickert emails Dr. D.D. regarding "Neuropathy

Pain NCD/LCDs." Glickert writes:

> I think you may have a HUGE problem with Sanexas treatments. I still don't
> believe that the "new codes" are legal and compliant.
>
> I've found an LCD from Noridian (A52725), it clearly states that treatment
> of neuropathy and/or neuropathic pain with electric stim devices are not
> medically necessary and not billable to Medicare. There is also another one
> from Palmetto that states nearly exactly the same (A56731).
>
> The use of peripheral nerve blocks for treating diabetic neuropathy is not
> considered reasonable and/or necessary and is not covered by Medicare
> Part A or B. Such use of peripheral nerve blocks is not supported by the
> current peer reviewed, published, evidence based scientific literature nor by
> specialty society guidelines. Claims are subject to review and recoupment.
>
> Benefits of Electrical stimulation

- May improve joint pain and swelling.

- Prevents and reveres muscle atrophy (loss of muscle mass/tissue)

- Enhances rehabilitation of muscles.

- Increases range of motion for tense muscles or tendons.

- Reduces stress and discomfort.

- Improves blood flow and circulation.

I don't see anything about nerve blocks

Article A57663 (CGS Administrators) clearly states that "Treatment protocols utilizing multiple injections per day on multiple days per week for the treatment of multiple neuropathies or peripheral neuropathies caused by underlying systemic diseases are not considered medically necessary."

Article A57589 and L35222 are WPS' LCDs and also clearly state treating neuropathy is not medically necessary. The use of nerve blocks or injections for the treatment of multiple neuropathies or peripheral neuropathies caused by underlying systemic diseases is not considered medically necessary. Medical management using systemic medications is clinically indicated for the treatment of these conditions. **You are not doing nerve blocks which is CPT code 64450 INJECTION(S), ANESTHETIC AGENT(S) AND/OR STEROID; OTHER PERIPHERAL NERVE OR BRANCH**

Coding the condition as pain (G89.4) and billing out electrical stimulation treatments and the vitamin blend seems to me to fall under the not medically necessary category.

I've heard you mention that clinics have to show medical necessity but it appears that no amount of testing can show that because Medicare does not consider the treatments to be medically necessary anyway.

(emphasis and color in original)

310.    On November 10, 2021, Glickert emailed a former sales representative of RST (K.D.) a summary of his work developing vitamin injections. Glickert notes: "One of the things I learned was that it was illegal to inject a compounded medication and bill for individual components of it. I learned this from [EBM]. In speaking with [M.E.] he

confirmed that (despite the fact that he had been sending claims for individual CPT codes/NDC numbers) that [EBM] was right." (emphasis added).

### O.    Glickert Received Kickbacks from RST In Exchange for Making Referrals

311.    On February 26, 2019, Glickert text messages M.J., "FYI, Sanexas is paying me to be a testimonial doctor and speak about my experience at the event. That doesn't change my opinion of the machine because this thing is amazing!!"

312.    On August 13, 2019, Glickert messages M.J. that he has a referral agreement with RST: "$1k if someone buys a machine. I've referred around 30 doctors in total to [K.D.]. Vast majority of them are not board members. Your board members got a special deal. $1k for me, $1k for you, $2k off the system."

313.    According to Defendants' interrogatory responses, Glickert "received approximately $15,000-20,000 from Sanexas between September 2018 and September 2019. The payments constituted a referral fee from Sanexas / Sales of units to customers [Glickert] referred. [Glickert] received a $1,000 fee for every system M.J. sold from September 2019 until the end of 2019/First part of 2020."

314.    In fact, RST issued at least 30 payments to Glickert, which total $48,500, for making referrals for providers to purchase to Sanexas devices. The dates of payments and payment amounts are reflected below:

| Date | Amount |
|------|--------|
| 1/10/2019 | $ 1,000.00 |
| 3/1/2019 | $ 1,000.00 |
| 5/3/2019 | $ 1,000.00 |
| 8/2/2019 | $ 1,000.00 |
| 2/8/2019 | $ 1,000.00 |
| 2/8/2019 | $ 500.00 |
| 2/8/2019 | $ 3,000.00 |

| | |
|---|---|
| 2/8/2019 | $ 1,000.00 |
| 3/29/2019 | $ 1,000.00 |
| 10/16/2019 | $10,000.00 |
| 10/16/2019 | $ 2,000.00 |
| 10/16/2019 | $ 3,000.00 |
| 10/16/2019 | $ 1,000.00 |
| 10/16/2019 | $ 2,000.00 |
| 11/15/2019 | $ 2,000.00 |
| 11/15/2019 | $ 2,000.00 |
| 11/15/2019 | $ 1,000.00 |
| 11/29/2019 | $ 3,000.00 |
| 12/16/2019 | $ 1,000.00 |
| 12/16/2019 | $ 1,000.00 |
| 12/16/2019 | $ 1,000.00 |
| 12/16/2019 | $ 1,000.00 |
| 12/16/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |
| 12/31/2019 | $ 1,000.00 |

315.    RST explicitly made the above payments to Glickert for referring providers to purchase Sanexas devices. For example, on September 18, 2019, RST emails Glickert in reference to "Dr. Glickert's referral fee for Dr. Warner" in the amount of $1,000.00. Likewise, on November 12, 2019, RST emails Glickert (who then forwards the email to Novof) and writes: "[D]r Stutz is a lead from Fluer De Lis (Dr Novof/Dr Glickert) Please give their distributorship the credit and subsequent earned commissions."

316.    Novof testified that he was aware of Glickert receiving referral fees from RST, which were separate and apart from the rebates that RST paid FDL.

### P.    FDL Was a Physician-Owned Distributor of Sanexas Devices

317.    On August 13, 2019, M.J. sent a text message to Glickert asking whether he is receiving a $2,000 referral fee from RST. Glickert responds on the same day: "I make $1k on the first machine. Nothing else on future machines. I've been thinking about starting my own distributorship because a lot of people are buying 2nd, 3rd machines, etc."

318.    On September 20, 2019, RST and FDL (by Novof) entered into a "Distributor Agreement." The Distributor Agreement provided that FDL would receive larger discounts on the MSRP of the Sanexas device based on its purchasing volume per quarter. As a result, FDL could charge its customers a price at or near the $49,500 MSRP and keep the difference. For example, if FDL purchased a Sanexas device for $32,175 and sold it for $49,500, it would have a $17,325 profit, as reflected below:

# SANEXAS DISTRIBUTION

## Volume Purchasing Programs

### SANEXAS neoGEN System                    $ 49,500 MSRP

| Dealer: | 5+ | 23% | $ 38,115 ea. |
|---|---|---|---|

| Distributor: | 10+ | 30% | $ 34,650 ea. |
|---|---|---|---|

Distributor requirements:

- Initial purchase of 10 Systems
- Minimum of 15 Systems purchased per quarter
- Quantities of 5 at a time, to maintain Distributor pricing

| Master Distributor: | 20+ | 35% | $ 32,175 ea. |
|---|---|---|---|

Master Distributor requirements:

- Initial purchase of 20 Systems
- Minimum of 30 Systems purchased per quarter
- Quantities of 10 at a time, to maintain Master Distributor pricing

319.    Novof testified that was the majority owner of FDL because he contributed the initial capital to fund the purchase of Sanexas units. Novof further testified that he took out a home equity line of credit on his primary residence in order to fund that initial purchase. Novof deemed that loan to be a significant risk, because his home could have been repossessed by the bank if he defaulted on the loan.

320.    The first shipment of Sanexas units purchased by FDL were shipped directly to Novof's primary residence.

321.    At one point, there was a waiting list to purchase Sanexas devices and FDL had a queue of customers that were waiting to receive their device. During this time, FDL faced no business risk, because it would not be stuck owning Sanexas devices that it may be unable to sell. Accordingly, FDL was simply receiving payments for referring providers who purchased Sanexas devices.

322.    FDL would also receive a "Rebate" based on the number of units sold, as copied below:

## Rebate Program

Units sold: 1-10              Rebate: $0

Units sold: 11-50            Rebate: $500.00

Units sold: 51-99            Rebate: $750.00

Units sold: for all units 100 +       Rebate: $1,000.00

323.    In practice, FDL purchased **over 50** Sanexas devices at a cost of over **$2 million** and successfully sold them to over 20 medical clinics located throughout the United States.

324.    FDL also received "Financial Points" in the form of a referral fee to a lender, Priority First, who financed the end users purchase of the Sanexas devices.

325.    In a text message to M.J. dated January 29, 2020, Glickert writes: "I know

86

[RST] hates me. They think I'm trying to steal their patents. [RST] doesn't like that I created my own blend. No one there returns my calls. I just don't understand what I did to them. I've helped them make a TON of money."

### Q.    FDL was a Physician-Owned Distributor under OIG Guidance

326.    Under the Distribution Agreement, FDL received compensation as a sales agent for the Sanexas device, which were billed to Medicare. FDL's sales agents, Glickert and Novof, were medical professionals.

327.    FDL was financially incentivized to maximize sales, because it received a volume discount on Sanexas devices as well as greater cash rebates.

328.    FDL lacks many of the indicia of a typical business, such as full-time employees, and was instead created and operated as a "shell" for the sole purpose of purchasing and selling Sanexas devices.

329.    Novof was the primary point of contact with RST for purchasing Sanexas devices. Novof testified that he had numerous day-to-day responsibilities for FDL, including ensuring that rebates from RST were received, distributing profits to himself and Glickert, negotiating credit for sales commissions with RST, and determining the amount of volume-based discounts to provide to customers.

330.    On December 30, 2020, Novof sent an email to RST asking for confirmation "when you have sent the 4th quarter rebate."

### R.    Defendants' Medicare and TRICARE Billing

331.    From September 17, 2018 through May 13, 2021, Vanguard billed Medicare Part B for 19,119 claims related to Sanexas treatment and/or vitamin injections, for which it was paid $354,276.51. The CPT and HCPCS codes billed to Medicare Part B are for Sanexas treatment (97016, 97032, 97110, 97112, 97150, G0283, 97530, 99202-05, 99212-

15) and vitamin injections (96372, J1955, J3411, J3415, J3420, J3475, J3490). Novof was listed as the referring provider in over 750 of these claims, and Glickert was listed as the referring provider in approximately 7 of these claims.

332.    From March 27, 2019 through May 28, 2020, Vanguard billed Medicare Part B for 70 claims related to ENFD testing, for which it was paid $4,539.46. The CPT and HCPCS codes billed to Medicare Part B for ENFD testing were 11104 and 11105.

333.    From October 29, 2019 through February 4, 2020, Vanguard billed Medicare Part B for 75 claims related to TM Flow testing, for which it was paid $1,406.29. The CPT and HCPCS codes billed to Medicare Part B for TM Flow testing were 95921, 95923, and 95943.

334.    Vanguard billed TRICARE for 554 claims, for which it was paid $2,729.34. The CPT and HCPCS codes billed to TRICARE are for Sanexas treatment (97016, 97032, 97112, 97150, G0283) and vitamin injections (J3411, J3415, J3420, J3475).

335.    In total, Defendants received reimbursements from Medicare and TRICARE for $362,951.60 of fraudulently billed Sanexas treatment, vitamin injections, TM FLOW testing, and ENFD testing.

      i.    *Sample Patient – W.B.*

336.    Patient W.B. was treated at Vanguard for chronic pain syndrome from March 28, 2019 through May 30, 2019, and Defendants billed 269 claims to Medicare. During his first visit, Defendants billed 29 claims to Medicare, which consisted of Sanexas treatment using two different one-on-one codes (97032 and 97112) and a vasopneumatic therapy code (97016); four vitamin injections (96372, J3411, J3420, J3415, J3490); and two punch biopsies (11104, 11105). There is no reasonable explanation (other than fraud) why three different codes would be used for the same patient on the same day for Sanexas

88

electric stimulation treatment. Meanwhile, between 1-4 units of each of these codes were billed to Medicare. For example, the 96732 injection code was billed four times at a total of 14 units, which implies that Patient W.B. received 14 injections during his first visit. Likewise, the various Sanexas treatment codes were billed out at a total of 18 units, which appears to be a tremendous amount of electric stimulation therapy.

337.    Because Patient W.B. never received another punch biopsy, the ENFD test could not be used to ascertain whether there was a purported improvement in his nerve health. Moreover, because W.B. received Sanexas treatment and vitamin injections on the same day that he received his punch biopsy (*i.e.*, before the test results could be read), the ENFD test had no clinical value.

ii.    *Sample Patient – R.S.*

338.    Patient R.S. was treated at Vanguard for chronic pain syndrome from November 21, 2019 through November 23, 2020, and Defendants billed 206 claims to Medicare. During his first visit, Defendants billed evaluation and management (E&M) codes for *both* a new patient visit (95921) and an established patient visit (99212). There is no reasonable explanation (other than fraud) how a patient on his first visit could be considered *both* a new patient and an established patient. On the same day, Defendants billed three codes related to TM Flow testing (95921, 95923, and 95943), along with a code related to an ultrasound study of arm and leg arteries (93922).

339.    Five days later, on November 26, 2019, Defendants billed three codes related to Sanexas treatment (97032, 97112, 97016) and four codes related to vitamin injections (96372, J3411, J3415, J3420). There is no reasonable explanation (other than fraud) why three different codes would be used for the same patient on the same day for Sanexas electric stimulation treatment. Meanwhile, between 1-4 units of each of these

codes were billed to Medicare.

340.    In total, R.S. presented to Vanguard to receive Sanexas treatment and/or vitamin injections on approximately 24 occasions. Remarkably, after more than 20 visits, Defendants billed an E&M code for patient R.S. as a new patient (99023).

### S.    Defendants Caused the False Medicare and TRICARE Billing of Neuropathy and Pain Solutions

341.    Neuropathy and Pain Solutions ("NPS") is an integrated chiropractic clinic that operated in Swansea, Illinois.

342.    In May 2020, Novof purchased a five percent (5%) stake in NPS for $2,000 and became its Medical Director.

343.    In or around July 2020, Defendants sold two Sanexas devices to NPS at a total cost of approximately $98,800. Defendants' records state that Glickert was the sales person and was paid a commission.

344.    Novof testified that he became Medical Director of NPS because: "Glickert made the sale and they needed a medical director and I was already in that sphere [at Vanguard] and so that's how I came about it and then they grew their business and needed more devices so they came to FDL."

345.    In his capacity as Medical Director, Novof did not see patients, but visited on a monthly basis and met with its nurse practitioner.

346.    Under Illinois law, a collaborative practice agreement is "is required for all advanced practice registered nurses engaged in clinical practice." 225 ILCS 65/65-35(a). Accordingly, Novof's service as Medical Director was necessary for NPS's offering of Sanexas treatment and related services to its patients, as well as a prerequisite for NPS's Medicare billing.

347.    In July 2020, Novof entered into a Collaboration Agreement with NPS' nurse practitioner. That agreement required Novof to "participate in the joint formulation and joint approval of orders or guidelines with the" nurse practitioner.

348.    As an owner of NPS, Novof shared in its profits, receiving a $3,550 distribution in 2020 and a $100,000 distribution in April 2021.

349.    In November 2021, Novof sold his 5% stake of NPS to its founder and majority owner for $20,000, thereby achieving an $18,000 profit. Novof had originally asked for $50,000 for his shares, but the parties agreed to a lower price due to the risk of Medicare suspensions and OIG fraud investigations that similar practices were facing. Indeed, Novof testified that the parties agreed on a lower price because Morningstar (see *infra*) received an audit and suspension from Medicare billing with allegations of fraud.

350.    Novof testified that he profited from NPS from the monthly stipends he received, the profit-sharing distributions he received, and the profit from the sale of his shares.

351.    Upon information and belief, NPS utilized templates developed by Defendants when billing Sanexas treatment and related services, including intake and diagnosis forms, billing and coding advice, and the CMN.

352.    Defendants caused NPS to submit approximately 2,242 claims for payment to Part B of the Medicare Program totaling $326,508.98 (as well as certain claims to TRICARE to be determined), which involved application of Sanexas, with or without accompanying vitamin injections.

### T.    Defendants Caused the False Medicare and TRICARE Billing of Morningstar Regenerative Medicine

353.    Morningstar Regenerative Medicine ("Morningstar") is an integrated

91

chiropractic clinic that operated in Glen Carbon, Illinois.

354.    In or around May 2020, Defendants sold two Sanexas devices to Morningstar at a total cost of approximately $98,800. Defendants' records state that Glickert was the sales person and was awarded a $10,000 commission.

355.    Around the same time, Novof became the Medical Director of Morningstar. Novof testified that, "Glickert sold the device," and Morningstar "need[ed] a medical director so I filled that role."

356.    In his capacity as Medical Director, Novof received a monthly stipend of between $1,500 to $2,000 from Morningstar. Novof visited Morningstar's office on a monthly basis. During his visits, Novof was present while nurses were performing Sanexas treatments.

357.    In August 2020, Defendants sold a third Sanexas device to Morningstar at a total cost of approximately $48,500. Defendants' records state that Glickert was the sales person and was paid a commission.

358.    On or around August 19, 2020, Novof had a text message conversation with Morningstar to confirm that Medicare billing would be done under a nurse's credentials, while billing during commercial carriers would be done under Novof's credentials.

359.    In October 2020, Defendants sold a fourth Sanexas device to Morningstar at a total cost of approximately $47,500. Defendants' records state that Glickert was the sales person and was paid a $5,000 commission.

360.    Novof's service as Medical Director was necessary for NPS's offering of Sanexas treatment and related services to its patients, as well as a prerequisite for NPS's Medicare billing..

361.    Upon information and belief, Morningstar utilized templates developed by

Defendants when billing Sanexas treatment and related services, including intake and diagnosis forms, billing and coding advice, and the CMN.

362.    Defendants caused Morningstar to submit approximately 2,189 claims for payment to Part B of the Medicare Program totaling $274,518.76 (as well as certain claims to TRICARE to be determined), which involved application of Sanexas, with or without accompanying vitamin injections.

**U.    Defendants Caused the False Medicare and TRICARE Billing of AIMC**

363.    Active Integrated Medical Centers, PC is a Professional Corporation organized under the laws of Pennsylvania that operated, at all relevant times, at the following two locations: AIMC – Downingtown, 797 East Lancaster Ave, Suite 6, Downingtown, PA 19335; and AIMC – Hershey, 555 East Chocolate Ave, Suite 201, Hershey, PA 17033.

364.    AIMC leased Sanexas devices beginning in or around December 2019.

365.    AIMC used NBI as its medical biller from approximately December 2019 through November 2020.

366.    On January 2, 2024, AIMC entered into a Settlement Agreement with the United States (the "AIMC Settlement").

367.    Recital D of the AIMC Settlement states: "From February 5, 2020 through April 14, 2022 ... AIMC submitted or caused to be submitted approximately 67,025 claims for payment to Part B of the Medicare Program... totaling $1,224,277.54. The underlying procedure for which AIMC submitted those claims involved application of [Sanexas], with or without accompanying vitamin injections. These claims were submitted under various procedure codes (97012, 97014, 97016, 97032, 97112, 97150, 99202, 99203, 99204,

99211, 99212, 99213, and G0283) and injection codes (96372, J1955, J3411, J3415, J3420, and J3490)."

368.    Defendants caused AIMC's Sanexas-related billing.

369.    AIMC purchased the "Glickert Blend" from EBM and billed the vitamin injections to Medicare.

370.    AIMC utilized templates developed by Defendants when billing Sanexas treatment and related services, including intake and diagnosis forms, billing and coding advice, and the CMN.

371.    AIMC also reviewed Defendants' instructions regarding the "Steps to prepare vitamin blend bag," which generally advised providers to prepare a large batch of the blend for use in all patients.

372.    AIMC reviewed Defendants' instructions regarding the number of vitamin injections to use for each part of the body and the appropriate site for the injections.

373.    AIMC reviewed Defendants' posts on the TX Fibro forum. For example, Defendants reviewed Glickert's post on December 27, 2019, which states: "I trusted and the process and I trust NBI...they have consistently gotten me paid – each and every month! They LOVE collecting money and getting insurance companies to pay...The money will come and I NEVER have a problem paying [NBI's] bill each month. This month, we'll top $200k in collections!"

374.    AIMC also reviewed a January 2, 2020 post by Glickert, which described going from near-bankruptcy in October 2018 to collecting $250,000 in Sanexas-related billing in December 2019. Glickert writes: "It's incredible to see where I was just one year ago. Truth be told – everyone here can do it – and will!"

## V.    Defendants Sold a Vitamin Injection Ingredient to another Provider in this District

375.    Healing Place Medical, P.C. ("HPM") is a Professional Corporation that operated, at all relevant times, a location at 1600 Horizon #123, Chalfont, PA 18914.

376.    At all relevant times, Gregory Thomas White Jr, DC ("White") was a chiropractor and owner of HPM.

377.    On October 4, 2024, HPM entered into a Settlement Agreement with HPM (the "HPM Settlement").

378.    Recital H of the HPM Settlement states: "From approximately August 18, 2020 through January 25, 2022 ... HPM submitted or caused to be submitted approximately 26,827 claims for payment to Part B of the Medicare Program ... totaling approximately $654,806.40. The underlying procedure for which HPM submitted those claims involved application of a Sanexas device, with or without accompanying vitamin injections. These claims were submitted under various procedure codes  (97012, 97016, 97032, 97110, 97112, 97116, 97535, 99203, 99204, 99212, 99213, 99214, and  G0283) and injection codes (96372, J1955, J3411, J3415, J3420, and J3490)."

379.    On September 9, 2021, Glickert created a post on TX Fibro titled "Thiamine HCL!," and writing: "I have thirty 2mL vials of Thiamine HCL I bought from HenrySchein. They have a beyond use date of 11/21 so I'm trying to get rid of them. I think I paid about $9.40/vial which is around $280 bucks. Make me an offer and I'll ship it out to you asap."

380.    White responded soon thereafter, offering to purchase the Thiamine HCL for $200 and pay via Venmo. Glickert responded, "Sold," provided his Venmo username, and asked for White's shipping address. White responded, "done thanks."

381.    As noted above, Thiamine HCL is an ingredient in the Glickert Blend.

## COUNT I

### Violations of the False Claims Act:

### Presentation of False Claims

### 31 U.S.C. § 3729(a)(1)(A)

### (All Defendants)

382.    The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

383.    From at least September 17, 2018 through May 13, 2021, Defendants knowingly presented or caused to be presented materially false or fraudulent claims to the United States, including claims for reimbursement by the Medicare Program and TRICARE that were false or fraudulent because they were for Sanexas treatment, vitamin injections, ENFD testing, or TM Flow testing that were not medically necessary and/or were not properly documented, in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(A).

384.    Defendants caused the United States to pay at least $362,000 for over 20,000 false claims submitted by Vanguard, over $326,000 for over 2,200 false claims submitted by NPS, and over $274,000 for over 2,100 false claims submitted by Morningstar, all of which related to Sanexas treatment, vitamin injections, ENFD testing, or TM Flow testing.

385.    As detailed above, the Medicare Program and TRICARE would not have otherwise paid these false or fraudulent claims.

386.    Defendants presented these claims or caused these claims to be presented, with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

387.    Defendants are jointly and severally liable to the United States for damages in an amount to be determined at trial, but not less than $963,979.34 in damages, trebled, as well as civil penalties of not less than $13,508 and not more than $27,018 for each false claim submitted to the Medicare Program and TRICARE, or as further adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 28 C.F.R. § 85.5.

## COUNT II
### Violations of the False Claims Act:
### Making or Using False Statements Material to a False Claim
### 31 U.S.C. § 3729(a)(1)(B)
### (All Defendants)

388.    The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

389.    From at least September 17, 2018 through May 13, 2021, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims for payment or approval by the Medicare Program and TRICARE for Sanexas treatment, vitamin injections, ENFD testing, or TM Flow testing that were not medically necessary and/or not properly documented, in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(B).

390.    The false records or statements appeared on CMS Form 1500 and/or its electronic equivalent, the 837P Form—where Defendants falsely certified to the United States, *inter alia*, that the Sanexas treatment, vitamin injections, ENFD testing, or TM Flow testing for which they sought payment were medically necessary—and on CMS Forms 855B and 855I—where Defendants falsely certified to the United States, *inter alia*, their compliance with all "Medicare laws, regulations

and program instructions."

391.   Defendants made these false representations for the purpose of causing to pay their false or fraudulent claims, which was the reasonable and foreseeable consequence of Defendants' statements and actions.

392.   The false records or statements were material to Defendants' claims for payment of the false claims because the Medicare Program and TRICARE would not have paid the claims absent the records or statements.

393.   Defendants presented these claims or caused these claims to be presented, with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard of whether or not they were false.

394.   Defendants are jointly and severally liable to the United States for damages in an amount to be determined at trial, but not less than $963,979.34 in damages, trebled, as well as civil penalties of not less than $13,508 and not more than $27,018 for each false claim submitted to the Medicare Program and TRICARE, or as further adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 28 C.F.R. § 85.5.

## COUNT III
### Violations of the False Claims Act:
### Improper Retention of an Overpayment (Reverse False Claims)
### 31 U.S.C. § 3729(a)(1)(G)
### (All Defendants)

395.   The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

396.   From at least September 17, 2018 through May 13, 2021, Defendants knowingly made, used, or caused to be made or used, a false record of statement

material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased their obligation to pay or transmit money or property to the Government. *See* 31 U.S.C. §§ 3729(a)(1)(G), 3729(b)(3) (defining "obligation").

397.   At least as of the filing of the Vanguard Complaint, Defendants knew that they had received reimbursements from Medicare and/or TRICARE for Sanexas treatment and vitamin injections that were not covered.

398.   Nevertheless, Defendants have knowingly avoiding paying the Government and/or knowingly improperly retained overpayments from Medicare and TRICARE.

399.   Defendants are jointly and severally liable to the United States for damages in an amount to be determined at trial, but not less than $963,979.34 in damages, trebled, as well as civil penalties of not less than $13,508 and not more than $27,018 for each false claim submitted to the Medicare Program and TRICARE, or as further adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. *See* 28 C.F.R. § 85.5.

## COUNT IV
### Violations of the False Claims Act:
### Conspiring to Commit a Violation of the False Claims Act (FCA Conspiracy)
### 31 U.S.C. § 3729(a)(1)(C)
### (All Defendants)

400.   From at least September 17, 2018 through May 13, 2021, Defendants conspired to commit a violation of subparagraph (A), (B), or (G) of 31 U.S.C. § 3729(a)(1). Defendants reached an agreement to defraud the Government and took at least one overt act in furtherance of the conspiracy.

401.    Defendants reached an agreement to violate the False Claims Act by, *inter alia*, agreeing to develop a scheme involving improper billing codes and misleading statements in support of coverage in order to bring about the Government's payment of false or fraudulent claims.

402.    Defendants intended to defraud the Government by submitting claims for Sanexas treatment, vitamin injections, ENFD testing, and TM Flow for reimbursement by Medicare and TRICARE that were not covered.

403.    The overt acts in furtherance of the conspiracy include, but are not necessarily limited to: developing the coding for medical billing of Sanexas treatment, vitamin injections, ENFD testing, and TM Flow; developing templates for medical billing of Sanexas treatment, vitamin injections, ENFD testing, and TM Flow; submitting thousands of claims for reimbursement by Medicare and TRICARE in furtherance of their conspiracy to get false or fraudulent claims allowed or paid; and creating a distributorship (FDL) to sell Sanexas devices to other medical providers with instructions on how to bill Medicare for Sanexas treatment and ancillary services.

404.    Defendants acted with the common purpose of obtaining a significant return on their investment of approximately $2 million in Sanexas devices by submitting false or fraudulent claims for Medicare and/or TRICARE reimbursement.

405.    Because of Defendants' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties.

### COUNT V

**Violations of the False Claims Act:**

**Presentation of False Claims (Kickbacks)**

**31 U.S.C. § 3729(a)(1)(A)**

**(All Defendants)**

406.    The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

407.    From at least September 17, 2018 through May 13, 2021, Defendants Glickert, Novof, and FDL knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1) (1986), amended by 31 U.S.C. § 3729(a)(1)(A) (2009).

408.    Upon information and belief, the claims were false or fraudulent because they were tainted by kickbacks that Defendants knowingly and willfully received and bargained for in exchange for referring providers to purchase Sanexas devices, in violation of the Anti- Kickback Statute, 42 U.S.C. §§ 1320a-7b(b), (g).

409.    Defendants Glickert and Novof owned and operated FDL, which was a POD for Sanexas device.

410.    Defendants Glickert, Novof, and FDL received kickbacks from RST in the form of discounts on devices and rebates that were based solely on the volume of referrals they made to providers that ultimately purchased Sanexas devices.

411.    The providers that Defendants referred to purchase Sanexas devices ultimately billed false or fraudulent claims for Sanexas treatment and vitamin injections to Medicare and TRICARE.

412.    Because of Defendants' false or fraudulent claims, the United States suffered damages.

413.    There is no safe harbor that applies to Defendants Glickert, Novof, and FDL's receipt of kickbacks from RST.

414.    Defendants are jointly and severally liable to the United States for damages in an amount to be determined at trial, but not less than $963,979.34 in damages, trebled, as well as civil penalties of not less than $13,508 and not more than $27,018 for each false claim submitted to the Medicare Program, or as further adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990. See 28 C.F.R. § 85.5.

## COUNT VI
### Payment by Mistake (False Claims)
### (All Defendants)

415.    The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

416.    The United States paid the claims described in this Complaint as a result of mistaken understandings of fact.

417.    Specifically, the United States paid those claims under the mistaken understanding that Defendants' procedures were reasonable, medically necessary, and properly documented, such that the United States mistakenly believed Defendants were entitled to receive payment for such claims.

418.    The mistaken understanding of the United States was material to its decision to pay Defendants for such claims.

419.    The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations that the claims were accurate, complete, and truthful, in accordance with the Medicare

Program and TRICARE, paid Defendants certain sums of money to which Defendants were not entitled.

420. The United States has been damaged because of this mistaken payment, and Defendants are thus liable to account for and pay to the United States such amounts, which are to be determined at trial.

## COUNT VII

### Payment by Mistake (Kickbacks)

### (All Defendants)

421. The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

422. The United States paid the claims described in this Complaint as a result of mistaken understandings of fact.

423. The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations that the claims were accurate, complete, and truthful, in accordance with the Medicare Program and TRICARE, paid Defendants certain sums of money to which Defendants were not entitled.

424. The mistaken understanding of the United States was material to its decision to pay Defendants for such claims, which were tainted by the receipt of kickbacks.

425. The United States has been damaged because of this mistaken payment, and Defendants are thus liable to account for and pay to the United States such amounts, but not less than $362,951.60 in damages, which are to be determined at trial.

## COUNT VIII

## Unjust Enrichment

## (All Defendants)

426.    The United States incorporates by reference the foregoing paragraphs as though fully set forth herein.

427.    From at least September 17, 2018 through May 13, 2021, the United States paid Defendants for medically unnecessary and/or improperly documented Sanexas treatment, vitamin injections, ENFD testing, and TM Flow testing.

428.    By directly or indirectly obtaining federal funds from the Medicare Program and TRICARE to which they were not entitled, Defendants were unjustly enriched at the expense of the United States and are liable to account and pay to the United States such amounts, or the proceeds therefrom, which are to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

I. On Counts I, II, III, IV, and V under the FCA, against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are permitted by law.

II. On Counts VI and VII for payment under mistake of fact, for an amount equal to the money paid by the United States to Defendants to which Defendants were not entitled, plus interest, costs, and expenses.

III. On Count VIII for unjust enrichment, for an amount equal to the monies that the Defendants obtained from the United States without right and by which they have been unjustly enriched, plus interest, costs, and expenses.

IV. All such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial.

Respectfully submitted,

DAVID METCALF
United States Attorney

/s/ Gregory B. David
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ Eric S. Wolfish
ERIC S. WOLFISH
Assistant United States Attorney
615 Chestnut St., Suite 1250
Philadelphia, PA 19106
(215) 861-8598
eric.wolfish@usdoj.gov

Dated: March 5, 2026